452 U.S. 615 (1981)
UNITED ASSOCIATION OF JOURNEYMEN & APPRENTICES OF THE PLUMBING & PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO, ET AL.
v.
LOCAL 334, UNITED ASSOCIATION OF JOURNEYMEN & APPRENTICES OF THE PLUMBING & PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, ET AL.
No. 80-710.
Supreme Court of United States.
Argued April 29, 1981.
Decided June 22, 1981.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT.
*616 Laurence Gold argued the cause for petitioners. With him on the briefs were Donald J. Capuano, Robert Matisoff, George Kaufmann, Richard C. Cooper, and Timothy R. Hott.
Jonathan G. Axelrod argued the cause for respondent Local 334, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada. With him on the brief were Hugh J. Beins, and Andrew F. Zazzali, Jr.
JUSTICE BRENNAN delivered the opinion of the Court.
Section 301 (a) of the Labor Management Relations Act, 1947 (the Taft-Hartley Act) provides jurisdiction in the federal district courts over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations." 61 Stat. 156, 29 U. S. C. § 185 (a) (emphasis added). The question presented in this case is whether a suit brought by a local union against its parent international union, alleging a violation of the international's constitution, falls within § 301 (a) jurisdiction of the federal district courts.

I
Respondent Local 334, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada (Local 334 or respondent), was a labor organization chartered by and affiliated with petitioner United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada (International or United Association), an international labor organization.[1] Composed of both plumbers and pipefitters in Morris County, N. J., Local 334 was one of 27 New *617 Jersey locals affiliated with the International prior to 1977. After failing in its attempt to urge the New Jersey locals to agree upon a voluntary consolidation plan, the International proposed its own plan that would consolidate nine northern New Jersey locals, including Local 334, into two locals, one representing plumbers, the other pipefitters.[2] Under the plan, the plumber members of Local 334 would be transferred into Plumbers Local 14, and the pipefitter members of Local 334 into Pipefitters Local 274.
When the locals declined to agree to the International's plan,[3] the International issued an order of consolidation on August 4, 1977, based on the proposed plan, pursuant to § 86 of the constitution of the United Association. That section, entitled "Consolidation of Locals," provides:
"Whenever, in the judgment of the General President, it is apparent that there is a superfluous number of Local Unions in any locality, and that a consolidation would be for the best interest of the United Association, locally or at large, he shall have the power to order Local Unions to consolidate and to enforce the consolidation of said Local Unions, or said territory in one or more Local Unions, provided such course received the sanction of the General Executive Board." App. 25.
After receiving no response to a letter sent to the General Executive Board requesting a stay of the order pending appeal, *618 Local 334 on August 22, 1977, filed suit against the International in the Superior Court of New Jersey seeking to enjoin enforcement of the order of consolidation. Local 334 alleged in its complaint, inter alia, that § 86 did not permit division of the membership of a local into separate work classifications, that the action of United Association did not constitute a consolidation of local unions, and that the general president had abused his discretion. Complaint ¶ 11, id., at 21. Claiming that it would suffer "substantial and irreparable injury to plaintiffs' [sic] property and property rights as members of Local 334" unless the consolidation was prevented, Complaint ¶ 13, id., at 21, the Local requested equitable relief enjoining United Association to return the Local's charter and seal, directing it to process the Local's internal appeal to the International's General Executive Board, and preventing it from threatening the Local's officers and members with expulsion and loss of membership. Id., at 22.[4]
The International removed the case to the United States District Court for the District of New Jersey, pursuant to 28 U. S. C. § 1441.[5] Local 334 filed a motion to remand the case to the state court, which the District Court denied. App. 98-99. Following completion of discovery and cross-motions for summary judgment, the District Court ruled in favor of the International. The court first concluded that it lacked jurisdiction to hear the case because the Local had failed *619 to exhaust internal union remedies. App. to Pet. for Cert. 22a-23a. In the alternative, the court ruled on the merits that there was "ample basis for the [International's] interpretation of the Constitution as well as the application of that interpretation in the Order of Consolidation of August 4, 1977." Id., at 28a.
On appeal, the United States Court of Appeals for the Third Circuit, sua sponte, raised the question of federal-court jurisdiction under § 301 (a) and requested supplemental briefing on that issue from the parties. 628 F. 2d 812, 813 (1980). After canvassing treatment of this issue by other Courts of Appeals, the court held that "[s]uits concerning intra-union matters that do not have a significant impact on labor-management relations or industrial peace are outside the scope of § 301 (a)." Id., at 820. Examining Local 334's allegations in its complaint, the court concluded that any alleged potential effect of the order of consolidation on labor-management relations or industrial peace would not pass the "significant impact" test and that the District Court therefore lacked jurisdiction under § 301 (a). Ibid. Accordingly, the court vacated the judgment of the District Court and remanded with instructions to remand the case to the state court. Ibid. We granted the International's petition for certiorari, 449 U. S. 1123 (1981), to resolve this important question of labor law. We reverse.

II
Section 301 (a) establishes federal district court jurisdiction for "[s]uits for violation of contracts . . . between any . . . labor organizations [representing employees in an industry affecting commerce as defined in this chapter]." 29 U. S. C. § 185 (a). On its face, the statute appears to comprehend the instant dispute. First, United Association's constitution may be fairly characterized as a contract between labor organizations. We have described a union constitution as a "fundamental agreement of association." Coronado Coal Co. v. *620 Mine Workers, 268 U. S. 295, 304 (1925);[6] see Carbon Fuel Co. v. Mine Workers, 444 U. S. 212, 217 (1979). The Courts of Appeals are unanimous that a union constitution can be a "contract between labor organizations" within the meaning of § 301 (a). See, e.g., Alexander v. International Union of Operating Engineers, AFL-CIO, 624 F. 2d 1235, 1238 (CA5 1980); Studio Electrical Technicians Local 728 v. International Photographers of the Motion Picture Industries, Local 659, 598 F. 2d 551, 553 (CA9 1979); Local Union No. 657 v. Sidell, 552 F. 2d 1250, 1252-1256 (CA7), cert. denied, 434 U. S. 862 (1977); Trail v. International Brotherhood of Teamsters, 542 F. 2d 961, 968 (CA6 1976); National Assn. of Letter Carriers, AFL-CIO v. Sombrotto, 449 F. 2d 915, 918 (CA2 1971); Parks v. International Brotherhood of Electrical Workers, 314 F. 2d 886, 916-917 (CA4), cert. denied, 372 U. S. 976 (1963).[7] *621 Indeed, even the decision of the Court of Appeals for the Third Circuit on review here recognized that a union constitution would be a "contract" within the meaning of § 301 (a) as long as the plaintiff made "specific factual allegations of actions which have a significant impact on labor-management relations or industrial peace." 628 F. 2d, at 820.[8] And respondent in its complaint alleged that "[t]he relationship (rights and duties) between Local 334 and the International is governed by the said Constitution." Amended Complaint, First Count ¶ 3, App. 55.
We have also noted that the prevailing state-law view is that a union constitution is a contract. Machinists v. Gonzales, 356 U. S. 617, 618-619 (1958) (discussing that aspect of union constitution constituting a contract between members and union). In particular, the view of a union constitution as a contract between parent and local unions was widely held in the States around the time § 301 (a) was enacted. See, e. g., Locals 1140 and 1145 v. United Electrical, Radio and Machine Workers of America, 232 Minn. 217, 221-222, 45 N. W. 2d 408, 411 (1950); International Union of United Brewery, Flour, Cereal, Soft Drink & Distillery Workers of America, C. I. O. v. Becherer, 4 N. J. Super. 456, 459, 67 A. 2d 900, 901, cert. denied, 3 N. J. 374, 70 A. 2d 537 (1949); Local *622 Union 13013, District 50, U. M. W. v. Cikra, 86 Ohio App. 41, 49, 90 N. E. 2d 154, 158 (1949); Bridgeport Brass Workers Union, Local 320 of the International Union of Mine, Mill and Smelter Workers v. Smith, 15 Conn. Supp. 505, 511-512 (Super. Ct. 1948), aff'd, 136 Conn. 654, 74 A. 2d 191 (1950); Textile Workers Local 204 v. Federal Labor Union No. 21500, 240 Ala. 239, 243, 198 So. 606, 609 (1940). See also Alexion v. Hollingsworth, 289 N. Y. 91, 96-97, 43 N. E. 2d 825, 827 (1942). See generally 87 C. J. S., Trade Unions §§ 42-43, pp. 836-842, 837, n. 39, 838, n. 53 (1954).
Second, just as a union constitution is a "contract" within the plain meaning of § 301 (a), so too is it clear that United Association and Local 334 are "labor organization[s] representing employees in an industry affecting commerce as defined in this chapter." As defined in the Act, 29 U. S. C. § 152 (5), the term "labor organization" means
"any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."
We have entertained numerous cases brought under § 301 (a) where one of the parties was an international union, see, e. g., Automobile Workers v. Hoosier Cardinal Corp., 383 U. S. 696 (1966), or a local union, see, e. g., Drake Bakeries, Inc. v. Bakery & Confectionery Workers, 370 U. S. 254 (1962). Indeed, in Carbon Fuel Co. v. Mine Workers, we did not even pause to question the existence of § 301 (a) jurisdiction in a suit brought by a coal company against an international union, an affiliated district union, and three affiliated local unions. 444 U. S., at 214.
If the plain meaning of the "contracts between labor organizations" clause of § 301 (a) supports jurisdiction in the instant case, its legislative history hardly upsets such an interpretation. *623 That is because there is no specific legislative history on that phrase to explain what Congress meant. The provision for suits between labor organizations was inserted late in the bill's history by the House-Senate Conference Committee. H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 65-66 (1947), 1 NLRB, Legislative History of the Labor Management Relations Act, 1947, pp. 569-570 (hereafter Leg. Hist.); 93 Cong. Rec. 6445 (1947); 2 Leg. Hist., at 1535, 1543; see Retail Clerks v. Lion Dry Goods, Inc., 369 U. S. 17, 26 (1962). The Conference Report and postconference debates contain no explanatory remarks about this addition. The only reference to the clause was made in a summary of the Act prepared by Senator Taft and inserted in the Congressional Record, which merely recited: "Section 301 differs from the Senate bill in two respects. Subsection (a) provides that suits for violation of contracts between labor organizations, as well as between a labor organization and an employer, may be brought in the Federal courts." 93 Cong. Rec. 6445 (1947), 2 Leg. Hist., at 1543.
Relying primarily on decisions from other Courts of Appeals, the Court of Appeals below was "persuaded by the view that disputes between local and parent unions must involve events which potentially have a significant impact on labor-management relations or industrial peace in order for there to be jurisdiction under § 301 (a)." 628 F. 2d, at 818. It is no doubt true that the primary purpose of the Taft-Hartley Act was "to promote the achievement of industrial peace through encouragement and refinement of the collective bargaining process." Charles Dowd Box Co. v. Courtney, 368 U. S. 502, 509 (1962); see Textile Workers v. Lincoln Mills, 353 U. S. 448, 452-455 (1957). As the Senate observed, "[s]tatutory recognition of the collective agreement as a valid, binding, and enforceable contract . . . will promote a higher degree of responsibility upon the parties to such agreements, and will thereby promote industrial peace." S. Rep. No. 105, 80th Cong., 1st Sess., 17 (1947), 1 Leg. Hist., at 423.
*624 But apparently Congress was also concerned that unions be made legally accountable for agreements into which they entered among themselves, an objective that itself would further stability among labor organizations. Therefore, § 301 (a) provided federal jurisdiction for enforcement of contracts made by labor organizations to counteract jurisdictional defects in many state courts that made it difficult or impossible to bring suits against labor organizations by reason of their status as unincorporated associations. See Charles Dowd Box Co. v. Courtney, supra, at 510; 93 Cong. Rec. 5014 (1947) (comments of Sen. Ball, a floor leader of the bill) ("because unions are voluntary associations, the common law in a great many States requires service on every member of the union, which is very difficult);[9] S. Rep. No. 105, supra, at 15, 1 Leg. Hist., at 421; Comment, Applying the "Contracts Between Labor Organizations" Clause of Taft-Hartley Section 301: A Plea for Restraint, 69 Yale L. J. 299, n. 2 (1959). Surely Congress could conclude that the enforcement of the terms of union constitutionsdocuments that prescribe the legal relationship and the rights and obligations between the parent and affiliated localswould contribute to the achievement of labor stability. Since union constitutions were probably the most commonplace form of contract between labor organizations when the Taft-Hartley Act was enacted (and probably still are today), and Congress was obviously familiar with their existence and importance, we cannot believe that Congress would have used the unqualified term "contract" without intending to encompass that category of contracts represented by union constitutions. Nothing in the language and legislative history of § 301 (a) suggests any special qualification *625 or limitation on its reach, and we decline to interpose one ourselves.[10]
Respondent goes even further than the Court of Appeals view that only disputes with a "significant impact" on labor-management relations should trigger § 301 (a) jurisdiction, arguing that § 301 (a) should never extend to disputes arising under union constitutions because "[t]he 80th Congress clearly did not intend to intervene in the internal affairs of labor unions." Brief for Respondent 16-17. In support of its position, respondent cites several provisions of the Labor Management Relations Act,[11] some general statements in the legislative history,[12] and our decision in NLRB v. Allis-Chalmers Mfg. Co., 388 U. S. 175, 184 (1967), where we observed in connection with § 8 (b) (2) of the Act[13] that "Congress *626 expressly disclaimed . . . any intention to interfere with union self-government or to regulate a union's internal affairs."[14] Respondent's argument falls wide of the mark. There is an obvious and important difference between substantive regulation by the National Labor Relations Board of internal union governance of its membership, and enforcement by the federal courts of freely entered into agreements between separate labor organizations.[15] See Parks v. International Brotherhood of Electrical Workers, 314 F. 2d, at 915-916. In discussing the section in the Taft-Hartley Act on unfair labor practices with respect to the employer-union relationship, the House-Senate Conference stated: "Once parties have made a collective bargaining contract the enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 42 (1947) (emphasis added), 1 Leg. Hist., at 546; see Teamsters v. Lucas Flour Co., 369 U. S. 95, 101, n. 9 (1962). Similarly, Congress chose in § 301 (a) to have contracts between labor organizations enforced by the federal courts.
*627 We need not decide today what substantive law is to be applied in § 301 (a) cases involving union constitutions. It is enough to observe that the substantive law to apply "is federal law, which the courts must fashion from the policy of our national labor laws." Textile Workers v. Lincoln Mills, 353 U. S., at 456. Whether the source of that federal law will be state law, id., at 457, see Automobile Workers v. Hoosier Cardinal Corp., 383 U. S., at 704-705, or other principles can be left to another case.[16] But it is far too late in the day to deny that Congress intended the federal courts to enjoy wideranging authority to enforce labor contracts under § 301. We do not need to say that every contract imaginable between labor organizations is within § 301 (a). It is enough to hold, as we do now, that union constitutions are.
Reversed.
CHIEF JUSTICE BURGER, dissenting.
The Court holds today that union constitutions are "contracts between . . . labor organizations" within the meaning of § 301 (a) of the Labor Management Relations Act, 29 U. S. C. § 185 (a). To reach this result, the Court claims to rely on the plain meaning of the statute, uncontradicted by the legislative history. Unlike the Court, I cannot construe these simple English words in such a convoluted fashion. To me, it is abundantly clear that a union constitution is not a contract between labor organizations, and the legislative history confirms that this reading comports with Congress' intent in adopting the Act.
I agree with the Court, of course, that a union and its locals are "labor organizations" as defined by § 2 (5) of the National *628 Labor Relations Act, 29 U. S. C. § 152 (5). I also am willing to accept, at least for purposes of this case, the Court's conclusion that a union constitution is a "contract." But I do not believe it reasonably can be described as a contract between labor organizations. To the extent a union constitution is a contract at all, it is a contract only between the union and its members or among the members themselves; it is not between the national or international union and its constituent locals. Although the degree of autonomy given locals may vary from union to union, they nonetheless are "subordinate bodies." Roomkin, Union Structure, Internal Control, and Strike Activity, 29 Ind. & Lab. Rel. Rev. 198, 199 (1976). "Local unions are mere subdivisions of the national organizations whose constitutions provide for their government as a state does for its counties, cities, towns, and villages." W. Leiserson, American Trade Union Democracy 87 (1959) (emphasis added). Accord, id., at 280; Cook, Dual Government in Unions: A Tool for Analysis, 15 Ind. & Lab. Rel. Rev. 322, 330, 331 (1962). Thus, locals are creatures of the national or international union and, indirectly, of the workers. Obviously, then, union constitutions are not "contracts between . . . labor organizations"; the plain meaning of § 301 (a) does not confer jurisdiction over disputes arising out of violations of union constitutions.[1]
As we recently noted in Rubin v. United States, 449 U. S. 424, 430 (1981), "[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete," unless unusual circumstances are present. One of those circumstances may be a clear indication in the legislative history that Congress intended some other meaning. Here, however, no such indication is present. The Court recognizes that "there is no specific legislative history on that phrase to explain what *629 Congress meant," ante, at 623; accordingly, the plain meaning, which does not confer jurisdiction over constitutional disputes, should govern. Indeed, JUSTICE BRENNAN, in the opinion for the Court in NLRB v. Allis-Chalmers Mfg. Co., 388 U. S. 175, 185-187 (1967), amply demonstrated that the only discussion in the legislative history of regulating internal union matters indicates that the principal authors of the Act expressly disclaimed any intention of intervening in such disputes. See also ante, at 625-626.[2]
The Court attempts to explain these passages by saying that Congress, in enacting § 301 (a), merely was providing for the "enforcement . . . of freely entered into agreements . . . ." Ante, at 626. This is no answer when the Court also holds that the substantive law applicable "`is federal law, which the courts must fashion from the policy of our national labor laws.'" Ante, at 627 (quoting Textile Workers v. Lincoln Mills, 353 U. S. 448, 456 (1957)). Similarly, remarks in Committee Reports and on the floor regarding the accountability of unions for their agreements were all made in relation to collective-bargaining agreements with employers; there is no reference to a local's invoking the jurisdiction of the federal courts to enforce the provisions of union constitutions. Thus, the legislative history is fully consistent with holding that a union constitution is not a contract between labor organizations as such.
It is not irrelevant that, 12 years after the adoption of the Labor Management Relations Act in 1947, Congress expressly chose to engage in regulation of internal union matters by enacting the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519 (codified at 29 U. S. C. § 401 et seq.).[3] The Court has recognized before that the 1959 Act *630 was "the first comprehensive regulation by Congress of the conduct of internal union affairs . . . ." NLRB v. Allis-Chalmers Mfg. Co., supra, at 193 (emphasis added). Moreover, the careful construction and the comprehensiveness of the provisions adopted in 1959 lead to a presumption that Congress deliberately excluded from the regulatory scheme other remedies regarding internal union disputes. See Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U. S. 630, 644-645 (1981); Northwest Airlines, Inc. v. Transport Workers, 451 U. S. 77, 97 (1981).[4]
When examined in terms of its plain meaning, its legislative history, and the whole fabric of federal labor law, § 301 (a) clearly does not confer jurisdiction over disputes under union constitutions. Moreover, the Court's decision today invites resort to the federal courts for cases better resolved outside the federal judiciary. Accordingly, I dissent.
JUSTICE STEVENS, with whom JUSTICE REHNQUIST joins, dissenting.
Congress has defined the essential elements of the Nation's labor policy by creating certain basic federal rights and providing procedures for their enforcement. To enable the federal *631 courts to carry out that basic policy, the Court in Textile Workers v. Lincoln Mills, 353 U. S. 448, construed § 301 (a) of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185 (a), as a grant of authority to fashion substantive rules of law concerning the making and enforcement of contracts between management and labor. The question this case presents is whether that statute conferred any such lawmaking power on the federal courts in cases arising out of contracts between two labor organizations.
In Textile Workers v. Lincoln Mills, supra, the Court was presented with the question whether § 301 (a), which "is drafted in terms which appear to be exclusively jurisdictional," Textile Workers Union v. American Thread Co., 113 F. Supp. 137, 139 (Mass. 1953), was meant by Congress to be an authorization for "federal courts to fashion a body of federal law for the enforcement of . . . collective bargaining agreements. . . ." 353 U. S., at 451. After examining the legislative history of § 301, the Court concluded that Congress intended to make collective-bargaining agreements between unions and employers binding on both parties and, more importantly, to provide for a "procedure for making such agreements enforceable in the courts by either party." Id., at 453.[1] *632 Because Congress had unambiguously declared its purpose to encourage the collective-bargaining process by making collective-bargaining agreements enforceable by the Judiciary, see id., at 453-456, the Court concluded that the remedy fashioned by the District Court, specific performance of an agreement to arbitrate a dispute over a grievance, was a proper implementation of the national policy that Congress had defined. Thus the Court's holding that a federal court could order specific enforcement of such an agreement created a new rule of law not supported by express statutory authority. Rather it was one example of the "range of judicial inventiveness" implicitly authorized by Congress. Id., at 457. The Court also concluded that such authorization was not unconstitutional, because "[t]he power of Congress to regulate these labor-management controversies under the Commerce Clause is plain." Ibid.[2]
*633 Two important conclusions may be derived from the Court's opinion in Lincoln Mills. First, underlying the Court's holding was the settled principle that because of the effect of collective-bargaining agreements on industrial peace, the regulation of those agreements is a permissible exercise of Congress' power under the Commerce Clause. Therefore, if § 301 authorized the creation of federal common law, then cases brought pursuant to that section would be cases "arising under" the "laws" of the United States within the meaning *634 of Art. III, § 2, of the Constitution.[3] Second, the legislative history of § 301 provided the basis for the Court's conclusion that § 301 was not merely a grant of jurisdiction in cases involving agreements between unions and employers but rather was a congressional authorization for the federal courts to create substantive rules to promote the important federal interests underlying the enforcement of collective-bargaining agreements. Therefore, the federal interest in industrial peace and the authorization to federal courts under § 301 to create rules to enforce collective-bargaining agreements have together resulted in the creation of federal rights for both unions and employers.[4]
Neither of the basic conclusions emerging from Lincoln Mills is applicable to suits on contracts between labor unions. First, there is no indication in the statute that Congress has concluded that disputes over contracts between unions present the threat to industrial peace sufficient to justify Congress' exercise of its power under the Commerce Clause.[5] *635 More importantly, even were there such indication, the legislative history of § 301 provides no support for a conclusion that Congress intended the courts to create substantive law to govern contractual disputes between unions. The legislative history of the clause relating to agreements between labor organizations does not contain even the "few shafts of light" which the Court in Lincoln Mills found helpful in construing the clause relating to contracts between employers and unions. As the Court recognizes, ante, at 623, "there is no specific legislative history on the phrase to explain what Congress meant." The absence of such legislative history dictates the conclusion that Congress intended the clause "or between any such labor organizations" to be a mere grant of jurisdiction over all cases arising out of contracts between unions in which a federal question otherwise exists.[6] There is no justification for the conclusion that Congress perceived contracts between unions to involve any federal interest sufficient to warrant the creation of federal rights.
As the Court construes the statute, however, it purports to confer authorization on federal courts to create substantive *636 federal common law to govern disputes between two unions over a union constitution. The local union in this case, however, has no federal right to autonomy and the international has no federal right to consolidate its locals. Congress has identified no national policy favoring or disfavoring the consolidation of local unions.[7] Unless contracts between unions have some from of federal protection, the statute as the Court construes it is the equivalent of a statute authorizing federal jurisdiction over all litigation between people named Smith, Jones, or Stevens. Some such cases would present federal questions; some would not.[8] One union may rent office space to another, lend it money, or manage its credit union. No federal power is implicated by contracts of that kind,[9] and no *637 federal rights support the conclusion that courts with the limited jurisdiction described in Art. III of the Constitution may adjudicate issues arising out of such contracts.[10]
The conclusion that suits on contracts between labor unions are not cases "arising under" federal law is further illustrated by the choice of law that district courts would have to make in such cases. The Court states, ante, at 627, that courts must follow the command of Lincoln Mills by fashioning the federal law by looking to the "`policy of our national labor laws.'" See Lincoln Mills, 353 U. S., at 456. But in explaining the conclusion that federal interests justified the creation of a body of law to govern the enforceability of collective-bargaining agreements, the Lincoln Mills Court indicated that the broad lawmaking powers would be limited and guided by "the penumbra of express statutory mandates" and "by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy." Id., at 457. Five years later, in Teamsters v. Lucas Flour Co., 369 U. S. 95, the Court indicated that this national policy was best served by the establishment of a uniform body of law applicable to § 301 suits and held that state courts deciding § 301 suits must apply the federal common law.[11] In the context presented by *638 this case, however, because the statute does not give a clue as to the federal interest regarding contracts between unions, and because there is thus no federal scheme to follow, district courts will have little choice but to borrow state law.[12] Moreover, in the absence of some guideposts planted in federal interests, the ability to obtainand the need foruniformity will be greatly reduced. It is difficult to conceive how the Nation's interest in industrial peace will be served by the creation of a body of federal law which will be based on state law and which will in large part vary from State to State.
I believe that this case presents no substantive federal question.[13] *639 The case does not arise under "the laws of the United States," and the Court of Appeals was quite right in holding that it had no subject-matter jurisdiction.
I respectfully dissent.
NOTES
[1] United Association has approximately 550 affiliated local unions and 335,000 members in the United States and Canada. 628 F. 2d 812, 813 (CA3 1980).
[2] The plan also transferred plumber members of other locals into Plumbers Local 14, and pipefitter members of other locals into Pipefitters Local 274. A third local, representing metal trades employees of the New Jersey Public Service Electric and Gas Co., was also established under the proposed plan. Local 334 members were not involved with this third local.
[3] On behalf of United Association, a hearing officer conducted a hearing at which each of the locals affected by the consolidation plan was allowed to present its view of the plan. Following the hearing, the officer recommended adoption of the proposed consolidation plan to United Association's general president.
[4] The Local subsequently amended its complaint, alleging in addition that the general president abused his discretion within the meaning of § 86 "by failing to specify facts which would support his conclusion that Local 334 is a `superfluous' local union insofar as the Morris County, New Jersey area is concerned or that the elimination of Local 334 would be in the best interests of the United Association, locally or at large." Amended Complaint, Second Count ¶ 4, App. 61.
[5] Immediately following removal, Local 334 obtained a temporary restraining order against United Association enjoining enforcement of the order of consolidation. Id., at 66-67. The temporary restraining order was subsequently dissolved when the District Court denied the Local's request for a preliminary injunction.
[6] In Coronado, one of the issues in the case was whether the International union could be held liable for damages to property caused by a local strike called by an affiliated district organization. The International's constitution provided: "No district shall be permitted to engage in a strike involving all or a major portion of its members, without the sanction of an International Convention or the International Executive Board," and "Districts may order local strikes within their respective districts on their own responsibility, but where local strikes are to be financed by the International Union, they must be sanctioned by the International Executive Board." 268 U. S., at 299-300. Chief Justice Taft, writing for the Court, observed that "it must be clearly shown in order to impose . . . liability on [the International union] that what was done was done by their agents in accordance with their fundamental agreement of association." Id., at 304.
[7] In Smith v. United Mine Workers of America, 493 F. 2d 1241, 1243 (1974) (emphasis added), the Court of Appeals for the Tenth Circuit appeared to suggest that the word "contracts" in § 301 did not encompass union constitutions, although the court also noted that the controversy in that case "relates only to the construction and application of the union constitution and has nothing to do with labor-management relations," thus leaving open the question whether a constitution affecting labor-management relations might be a "contract" in the view of that court.

The Court of Appeals for the First Circuit, without deciding, has given strong indication that a union constitution can be a "contract" within the meaning of § 301 (a). In Local Union 1219 v. United Brotherhood of Carpenters and Joiners of America, 493 F. 2d 93, 96 (1974), the court noted that a charter given by an international to a local union could be a "contract." The Court of Appeals for the District of Columbia Circuit, in 1199 DC, National Union of Hospital and Health Care Employees v. National Union of Hospital and Health Care Employees, 175 U. S. App. D. C. 70, 72-73, 533 F. 2d 1205, 1207-1208 (1976), asserted that it "need not face the issue whether a union constitution is a § 301 (a) contract," absent the factual allegation of "actual threats to industrial peace."
[8] Even respondent concedes that a union constitution is a contract, albeit one "between members and their union and only secondarily . . . between affiliated bodies of a labor organization." Brief for Respondent 14-15, n. 10.
[9] Congress carefully reviewed data compiled on the laws of the States as to the status of labor organizations as legal entities. See, e. g., S. Rep. No. 105, 80th Cong., 1st Sess., 15-18 (1947), 1 Leg. Hist., at 421-424; H. R. Rep. No. 245, 80th Cong., 1st Sess., 108-109 (1947), 1 Leg. Hist., at 399-400.
[10] Respondent notes that, "had Congress intended in 1947 to make the provisions of a union's constitution enforceable in federal court, it could easily have done so explicitly." Brief for Respondent 13, n. 8. We find this a strange suggestion of statutory construction, for Congress specifically left the term "contracts" unqualified and inclusive. We also note that adoption of the "significant impact" test urged by the Court of Appeals would engage the federal courts in the sort of ad hoc judgments on the jurisdictional sufficiency of the pleadings that the unfettered language of § 301 (a) belies.
[11] Sections 8 (a) (3), 8 (b) (1) (A), and 8 (b) (2) of the Act, 29 U. S. C. §§ 158 (a) (3), (b) (1) (A), and (b) (2). For example, § 8 (b) (1) (A) states that "this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein."
[12] For example, Senator Ball, commenting on the proviso in § 8 (b) (1) (A), see n. 11, supra, stated: "It was never the intention of the sponsors of the pending amendment to interfere with the internal affairs or organization of unions." 93 Cong. Rec. 4272 (1947), 2 Leg. Hist., at 1141.
[13] Section 8 (b) (2) of the Act, 29 U. S. C. § 158 (b) (2), states:

"(b) It shall be an unfair labor practice for a labor organization and its agents
"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership . . . ."
[14] Respondent also cites the passage 12 years after the Taft-Hartley Act of the Landrum-Griffin Act of 1959, which we have described as "the first comprehensive regulation by Congress of the conduct of internal union affairs," NLRB v. Allis-Chalmers Mfg. Co., 388 U. S., at 193, as confirmation that, in the Taft-Hartley Act, Congress did not contemplate that § 301 (a) would reach union constitutions.
[15] In Allis-Chalmers, the issue was whether § 8 (b) (1) (A)'s prohibition of union activity to "restrain or coerce" employees in the exercise of their rights prevented the union from collecting fines from union members who declined to honor an authorized strike. We held that it did not, 388 U. S., at 195, and indeed suggested that the Act allowed court enforcement of reasonable fines, id., at 192-193. Allis-Chalmers thus dealt with substantive regulation by the NLRB of internal union affairs, not with enforcement of pre-existing contracts in the federal courts.
[16] We also need not decide whether individual union members may bring suit on a union constitution against a labor organization. See generally Smith v. Evening News Ass., 371 U. S. 195 (1962). Compare Abrams v. Carrier Corp., 434 F. 2d 1234, 1247 (CA2 1970), cert. denied sub nom. Steelworkers v. Abrams, 401 U. S. 1009 (1971), with Trail v. International Brotherhood of Teamsters, 542 F. 2d 961, 968 (CA6 1976).
[1] I intimate no view on whether a typical contract between a union and one of its localsfor example, for the sale of office equipment or the lease of propertywould give rise to jurisdiction under § 301 (a).
[2] Although these remarks were made with reference to another provision of the Act, they indicate that congressional silence, if anything, betokens no intent to subject internal union disputes to federal regulation.
[3] Of course, it is seldom, if ever, proper to construe a statute on the basis of statements made in subsequent Congress. Nevertheless, as JUSTICE BRENNAN, writing for the Court in NLRB v. Drivers, 362 U. S. 274, 291 (1960) (emphasis added), stated:

"To be sure, what Congress did in 1959 does not establish what it meant in 1947. However, as another major step in an evolving pattern of regulation of union conduct, the 1959 Act is a relevant consideration. Courts may properly take into account the later Act when asked to extend the reach of the earlier Act's vague language . . . ."
Assuming, arguendo, that § 301 (a) is vague, the adoption of provisions regulating internal union matters becomes relevant.
[4] The Court also relies on state cases that have treated union constitutions as contracts. Ante, at 621-622. How state courts, which have plenary authority to construe and develop the common law of contracts, regard union constitutions has little bearing on the construction of the Labor Management Relations Act.
[1] The Court admitted that the legislative history of § 301 is "somewhat cloudy and confusing" but found "a few shafts of light to illuminate our problem." 353 U. S., at 452. The Court noted that the Conference Committee had dropped a provision which would have made the failure to abide by an agreement to arbitrate an unfair labor practice because "the enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 42 (1947); 1 NLRB, Legislative History of the Labor Management Relations Act, 1947, p. 546 (hereinafter Legislative History). Both the Senate Report and the House Report indicated that collective-bargaining agreements should be binding and enforceable in the courts by either party. See 353 U. S., at 453. Moreover, Congress wanted to promote the inclusion of no-strike clauses in collective-bargaining agreements:

"The chief advantage which an employer can reasonably expect from a collective labor agreement is assurance of uninterrupted operation during the term of the agreement. Without some effective method of assuring freedom from economic warfare for the term of the agreement, there is little reason why an employer would desire to sign such a contract." S. Rep. No. 105, 80th Cong., 1st Sess., 16 (1947) (hereinafter 1947 Senate Report), 1 Legislative History, at 422.
Because agreements to arbitrate are the quid pro quo of a no-strike clause, the Court concluded that Congress intended agreements to arbitrate to be enforceable under § 301. 353 U. S., at 455.
[2] The Court cited NLRB v. Jones & Laughlin Steel Corp., 301 U. S. 1, for that proposition. In that case, decided in 1937, the Court sustained the constitutionality of the National Labor Relations Act as a valid exercise of Congress' power under the Commerce Clause. The Court stated:

"When industries organize themselves on a national scale, making their relation to interstate commerce the dominant factor in their activities, how can it be maintained that their industrial labor relations constitute a forbidden field into which Congress may not enter when it is necessary to protect interstate commerce from the paralyzing consequences of industrial war? We have often said that interstate commerce itself is a practical conception. It is equally true that interferences with that commerce must be appraised by a judgment that does not ignore actual experience.
"Experience has abundantly demonstrated that the recognition of the right of employees to self-organization and to have representatives of their own choosing for the purpose of collective bargaining is often an essential condition of industrial peace. Refusal to confer and negotiate has been one of the most prolific causes of strife." Id., at 41-42.
Thus 20 years later, when Lincoln Mills was decided, it was well settled that labor-management relations had an effect on interstate commerce. Moreover, although the legislative history of the LMRA is "cloudy and confusing" as to the question whether § 301 was substantive or jurisdictional, the legislative history of the statute and of § 301 in particular clearly indicates that the enforcement of collective-bargaining agreements has an effect on industrial peace and therefore on interstate commerce. The primary purpose of the Act was "to promote the achievement of industrial peace through encouragement and refinement of the collective bargaining process." Charles Dowd Box Co. v. Courtney, 368 U. S. 502, 509. With respect to the subject matter of § 301 the Senate Report stated:
"[T]o encourage the making of agreements and to promote industrial peace through faithful performance by the parties, collective agreements affecting interstate commerce should be enforceable in the Federal courts.
.....
"Statutory recognition of the collective agreement as a valid, binding, and enforceable contract is a logical and necessary step. It will promote a higher degree of responsibility upon the parties to such agreements, and will thereby promote industrial peace." 1947 Senate Report, at 16-17, 1 Legislative History, at 422-423.
[3] The Court did not rely on the view that § 301 had the effect of making a labor union a federal entity comparable to a national bank, with the consequence that a potential federal question concerning its authority might arise in any litigation to which it was a party, thus providing a basis for federal jurisdiction whenever a union was a litigant. See Osborn v. Bank of the United States, 9 Wheat. 738; Lincoln Mills, 353 U. S., at 470-473 (Frankfurter, J., dissenting).
[4] "In the 1947 Taft-Hartley Act Congress sought to promote numerous policies. One policy of particular importanceif not the overriding one was the policy of free collective bargaining. See Teamsters v. Lucas Flour Co., 369 U. S. 95, 104 (1962); NLRB v. Insurance Agents, 361 U. S. 477, 488 (1960); Textile Workers v. Lincoln Mills, supra, at 453-454." Carbon Fuel Co. v. Mine Workers, 444 U. S. 212, 218.
[5] Although it need not have looked beyond the legislative history of the Labor Management Relations Act to conclude that regulation of collective-bargaining agreements affect industrial peace, the Lincoln Mills Court cited Jones & Laughlin, supra, a case construing the NLRA, for that proposition. In this case, however, the Court has pointed to no other decisional or statutory authority indicating that all agreements between unions have an effect on industrial peace and thus on interstate commerce.
[6] The only reference to the clause in the legislative history, in a summary of the Act prepared by Senator Taft and inserted in the Congressional Record, does not indicate that the clause is anything more than jurisdictional:

"Section 301 differs from the Senate bill in two respects. Subsection (a) provides that suits for violation of contracts between labor organizations, as well as between a labor organization and an employer, may be brought in the Federal courts." 93 Cong. Rec. 6445 (1947), 2 Legislative History, at 1543.
Although this sentence refers also to the clause relating to agreements between a labor organization and an employera clause which is more than a grant of jurisdictionthe additional legislative history with respect to such agreements provides some justification for concluding that that portion of § 301 is substantive. No such justification is present, however, with respect to agreements between labor unions.
[7] The test adopted by the Court of Appeals in this case required district courts to identify a "significant impact on labor-management relations or industrial peace" prior to exercising jurisdiction under § 301. See 628 F. 2d 812, 820. The Court of Appeals found no such impact. In Lincoln Mills the Court not only found a federal interest in the enforcement of collective-bargaining agreements but also specifically found a federal interest in enforcing the clause requiring arbitration at issue there. Because Congress was desirous of promoting agreements not to strike, and because agreements to arbitrate are the quid pro quo for agreements not to strike, the Court could infer a congressional belief that industrial peace could be fostered by the enforcement of such arbitration agreements. See 353 U. S., at 455.
[8] Because § 301 indisputably grants jurisdiction over contract actions between two unions, there is of course no need to give the statute the broad reading given it by the Court in any case in which there is otherwise a federal question and the case thus otherwise arises under federal law.
[9] Although the Court states, ante, at 627, that "[w]e do not need to say that every contract imaginable between labor organizations is within § 301 (a)," the Court cannot so easily limit its opinion. The Court's opinion permits the creation of federal law in a dispute implicating no federal interest. Absent a limitation restricting § 301 (a) jurisdiction on the basis of the presence of a federal interest or right, it will be difficult for district courts to determine what contracts are not encompassed by § 301 (a).
[10] If the statute is read the way that the Court reads it, its constitutionality is suspect, because the statute purports to give the federal courts jurisdiction over suits which are not "arising under" federal law within the meaning of Art. III, § 2, of the Constitution. Because, however, "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available," NLRB v. Catholic Bishop of Chicago, 440 U. S. 490, 500, and because I accordingly interpret the statute to be no more than a grant of jurisdiction, I would not reach the constitutional question.
[11] The Court recognized the federal interest in uniformity:

"[T]he subject matter of § 301 (a) `is peculiarly one that calls for uniform law.' Pennsylvania R. Co. v. Public Service Comm'n, 250 U. S. 566, 569; see Cloverleaf Butter Co. v. Patterson, 315 U. S. 148, 167-169. The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.
.....
"The importance of the area which would be affected by separate systems of substantive law makes the need for a single body of federal law particularly compelling. The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace. State law which frustrates the effort of Congress to stimulate the smooth functioning of that process thus strikes at the very core of federal labor policy. With due regard to the many factors which bear upon competing state and federal interests in this area, California v. Zook, 336 U. S. 725, 730-731; Rice v. Santa Fe Elevator Corp., 331 U. S. 218, 230-231, we cannot but conclude that in enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." 369 U. S., at 104-105.
[12] The petitioners agree that the "federal common law" will be borrowed from state law, and as the following statement by petitioners' counsel at oral argument illustrates, existing federal law may contribute little to the formulation of the new "federal" rule:

"Where the federal courts have to create a body of law, we don't believe that the normal course is to start from scratch. It's a process of incorporation except in the case of incompatibility. It's difficult for me to visualize an incompatibility between federal law and state law if the dispute is on whether a local union which owes another local union that is unrelated $500 has in fact violated a promissory note." Tr. of Oral Arg. 16.
[13] This case is important not because of its unremarkable holding that a union constitution is a contract but because the case is a striking example of the easy way in which this Court enlarges the power of the Federal Governmentand the Federal Judiciary in particularat the expense of the States.