Santo A. FAMULARE, Costa A. Michalakis, and Roger M. Lenfest, Plaintiffs,

v.

UNITED TRANSPORTATION UNION INTERNATIONAL, Fred A. Hardin, Individually and in his capacity as President and Chairman of the Board of Directors of United Transportation Union International, L.R. David, Individually and in his capacity as Vice President of United Transportation Union International, W.L. Wotaszak, Individually and in his capacity as Vice President of United Transportation International, and the National Railroad Passenger Corporation, Defendants.

No. 86 Civ. 1846 (CLB).

United States District Court, S.D. New York.

June 27, 1986.

John G. DiPersia, Charles Gotsch, Cahill, Coetsch & DiPersia, P.C., New Haven, Conn., for plaintiffs.

Mark S. Landman, Siff, Newman, Rosen & Parker, P.C., Broadway, N.Y., Joanna L. Moorhead, Associate General Counsel, National Railroad Passenger Corp., Washington, D.C., for Amtrak.

Clinton J. Miller, III, UTU, Cleveland, Ohio, for Union defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

By cross motions for summary judgment, this Court is asked to adjudge the validity of a collective bargaining agreement entered into between the National Railroad Passenger Corporation, known as Amtrak, and the United Transportation Union (UTU) that will regulate employment relations on Amtrak-operated lines outside of the Northeast Corridor, which extends from Washington, D.C. to Boston. UTU is the collective bargaining representative for the passenger conductors, assistant passenger conductors, passenger firemen and engine assistants (train and engine crews) on these lines.

This action was instituted by three UTU members who allege that their Union, through the acts of its President and Vice President, usurped the exclusive, constitutional authority of the Union's General Committees of Adjustment by negotiating and contracting with Amtrak without the Committees' input or approval. Plaintiffs' first claim alleges a breach of the duty of fair representation arising under the Railway Labor Act, 45 U.S.C. § 151 *et seq.;* the

second, pendent claim attacks the formation of the agreement as violative of the Union constitution.

Since 1970, when it was created by an act of Congress, Amtrak has gradually assumed the responsibility of providing passenger railway service from existing carriers that wished to discontinue that service. In order to effect the transition with minimum disruption, Amtrak relied on personnel furnished by contract from the freight railroads over whose tracks Amtrak operated. Until it became feasible to provide otherwise, these persons remained employees of the freight railroads, their terms and conditions of employment governed by the collective bargaining agreements negotiated between their unions and the freight lines.

Nevertheless, by 1980 Amtrak had entered into a direct employment relation with all of its personnel, excluding only the train and engine crews, who continued to work for Amtrak on contractual loan from their employers. In 1981, Congress ordered Amtrak to complete the direct employment of personnel on the Northeast Corridor. See § 1165 of the Northeast Rail Service Act of 1981, 45 U.S.C. § 1113. By statute, Amtrak was required to negotiate with the employer, Conrail, as well as with the employees whom Amtrak was directed to hire. Id. In the course of negotiations, Amtrak voluntarily recognized the bargaining authority of UTU, which represented the Conrail personnel affected. Ultimately, a collective bargaining agreement with UTU was negotiated and implemented, and the Northeast Corridor was delivered to Amtrak's exclusive operation and control.

Amtrak's takeover of the Northeast Corridor did not alter the employment relations between Amtrak and the train and engine crews on other routes in the Amtrak system, known as Off-Corridor operations. These crews continued to perform services for Amtrak while hired and paid by seventeen contracting freight carriers. Finally, in 1985, spurred by the impending loss or reduction of federal subsidy, and the statutory mandate to achieve direct operation and control of all aspects of its rail passenger service "insofar as practicable," 45 U.S.C. § 545(a), Amtrak undertook to employ its own train and engine crews Off-Corridor, beginning with the East and Midwest routes. Although it arguably had no statutory obligation to do so, Amtrak evinced its intention to hire as its own employees the personnel then performing Off-Corridor Amtrak service. Amtrak therefore contacted officials of the labor organizations that represented the affected train and engine crews—including Larry J. Wotaszak, a vice president of UTU—and suggested that the parties confer in hopes of producing a satisfactory agreement. On January 29, 1986, following nearly five months of negotiations during which UTU succeeded in obtaining certain staffing and income concessions from Amtrak, an agreement pertaining to the conductors, assistant conductors, firemen and engine attendants was signed by two UTU vice presidents and four officials of Amtrak. UTU President Fred A. Hardin approved the agreement several days later.

As agreed, the first phase of the takeover was to be accomplished by April 1, 1985, with bids for Amtrak positions to be submitted no later than March 10, 1986. This application deadline was later extended to March 15, 1986 at the Union's request. By the close of the application period, Amtrak had received 1270 bids for 288 positions to be filled by UTU members. It has been represented to the Court that pursuant to the Union's collective bargaining agreements with the freight carriers, successful bidders for Amtrak positions would be entitled to a leave of absence from their present employment, enabling them to work for Amtrak for as long as six months without losing their seniority or other privileges should they choose to return to their former employers within that period.

This matter originally came before the Court on March 3, 1986, on an order to show cause why the defendants should not be temporarily and permanently enjoined from implementing the agreement de-

scribed above. The Court issued a temporary restraining order on March 11, 1986 limited to enjoining the defendants from treating as irrevocable any bid for Amtrak employment made pursuant to that agreement.

The plaintiffs are Union members in good standing and, at the time of filing this complaint, performed services for Amtrak's Off-Corridor operations under Amtrak's arrangement with the contracting carriers. In addition, both Famulare and Michalakis serve as elected Local Chairmen of their respective locals, and Lenfest is the General Chairman of the General Committee of Adjustment on the Boston & Maine Railroad.

In their individual capacities, the plaintiffs challenge the authority of the Union officials to enter into the Off-Corridor collective bargaining agreement with Amtrak. Citing Article 85 of the UTU Constitution, they contend that these officials usurped the decision-making powers expressly and exclusively conferred on the appropriate General Committees of Adjustment of each of the affected railroads, and that the agreement so conceived is void absent ratification by the Local or General Chairpersons. The Union's failure to respect this allocation of power amounts to a breach of its duty of fair representation, they assert, and also allege that Amtrak acted with knowledge, negotiating with the Union while aware of the UTU ratification requirement.

The defendants contend in response that Amtrak and the Union entered into a voluntary bargaining relationship that was outside the jurisdiction of these local and general committees, a circumstance that permitted the Union President, under his general constitutional powers, to take appropriate action that he perceived to be in the best interest of the employees represented. Accordingly, the Union argues, the contract was not *ultra vires* and may be enforced. Amtrak subscribes to this reasoning and adds that even assuming that the conduct of the Union officials exceeded constitutional constraints, Amtrak acted

reasonably in relying on the apparent authority of the Union's president and vice presidents to bargain and contract with Amtrak.

The Railway Labor Act imposes on a labor organization the duty of fair representation. *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). Accordingly, as the exclusive bargaining representative of a designated employee unit, a union has a statutory obligation "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967). A union is held to this duty of fair representation during all bargaining situations, including the negotiation, administration and enforcement of collective bargaining agreements. *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979).

■ Because a claim alleging a breach of this duty does not involve a dispute in the first instance between "an employee or group of employees and a carrier or group of carriers," 45 U.S.C. § 153 First (i), it does not fall within the jurisdiction of the National Railroad Adjustment Board. Therefore, it may be the basis of a suit in federal court. *See Conley v. Gibson*, 355 U.S. 41, 44–45, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Nor does the presence of Amtrak as a co-defendant vitiate that jurisdiction, where the plaintiffs allege that the employer participated in the allegedly improper conduct of the Union. *See Glover v. St. Louis-San Francisco Railway Co.*, 393 U.S. 324, 329, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969). Plaintiffs state a cognizable federal claim against the Amtrak even though they charge Amtrak with no wrongdoing apart from having engaged UTU officials in contract negotiations with knowledge that the Union allegedly had breached its duty of fair representation, to wit, by disregarding the constitution's ratification requirement. *See, e.g., O'Mara v.*

*Erie Lackawanna Railroad Company,* 407 F.2d 674, 679 (2d Cir.1969).

Turning now to plaintiffs' fair representation claim against the Union, this Court finds at the very outset no evidence of bad faith, dishonesty or discrimination on the part of the Union or its officers at any time during the contract negotiations. Indeed, Amtrak's determination to effect the transfer quickly, coupled with its expressed willingness to hire labor "off the street," forced the Union leadership to navigate between Scylla and Charybdis, as it risked either losing its members' jobs by inaction, precipitating a detrimental and perhaps unlawful strike, or perhaps contravening the Union constitution if it acted expediently. This Court finds that President Hardin and his associates at all times were motivated by what they believed to be the best interests of their Union and its membership, and that they commenced negotiations with Amtrak and approved the resulting collective bargaining agreement in complete good faith, in a desire to be practical in facing a difficult situation affecting the members.

■ Good faith, of course, will not excuse unconstitutional conduct nor will it legitimize an otherwise invalid or *ultra vires* agreement, if the Union officials exercised their discretion arbitrarily and without due regard for their obligations to the membership. Thus, the representation question posed here is simply whether the defendant UTU officials exceeded their authority to bargain with Amtrak, and improperly deprived the local and general committees of their opportunity to ratify the collective bargaining agreement before it was to be implemented.

Plaintiffs rely on Article 85 of the UTU constitution which provides in pertinent part:

> General Committees of Adjustment shall have authority to make and interpret agreements with representatives of transportation companies covering rates of pay, rules, or working conditions—all

in accordance with the provisions of this Constitution.

\* \* \* \* \* \*

> Between sessions of the General Committee of Adjustment, the Chairperson of such Committee shall exercise all rights, privileges, and authority vested in the General Committee, except as otherwise directed by the General Committee while in session.

\* \* \* \* \* \*

> The General Chairperson must poll the entire General Committee prior to signing any system agreements and be governed by the majority of the votes cast. The General Chairperson must poll the affected Local Chairpersons prior to signing any local agreements and be governed by the majority of the votes cast.

Plaintiffs argue that this language unequivocally confers on the General Committees of Adjustment the exclusive, absolute authority to enter into collective bargaining agreements with carriers such as Amtrak. They contend that this Article embodies a right so fundamental to the union's representative self-government that explicit language, there or elsewhere, correlatively limiting the President's authority to make such agreements is unnecessary. As evidence supporting their position, the plaintiffs cite two extrinsic sources. The first is a letter written three and a half years earlier by the President to various Union officials and Conrail in connection with the Northeast Corridor agreement, in which he reaffirms the General Committees' "complete authority in making agreements and protecting the interests of the members." Letter of Fred A. Hardin dated July 27, 1982 (Exhibit C of Plaintiffs' Verified Complaint for Injunctive Relief, filed March 3, 1986). The second is a magistrate's decision in the case of *Maloof v. UTU,* No. 78–3793 (E.D.Pa.1980), which upheld the same principle in a matter involving the duties of the UTU General Chairman.

The forthright language of Article 85 is beguiling, but in the opinion of this Court, it is not ultimately dispositive. In the first

place, that clause does not specifically confer sole and exclusive negotiation authority on the General Committees of Adjustment, nor, practically speaking, could it. That a congregation of so many General Chairpersons from at least seven different carriers could agree quickly, if at all, on the terms and conditions governing Amtrak's Off-Corridor operations is highly unlikely and indeed at variance with the history of America's labor organizations. Although the Union constitution contemplates an active, influential exercise of bargaining power by these committees, the constitution, considered in its entirety, is a flexible instrument that simultaneously entrusts to the president plenary authority to do whatever is necessary to protect the interests of the membership. Article 16, for example, directs the president to—"exercise general supervision over [the Union's] affairs and interests including all subordinate bodies" and confers on him not only those duties and responsibilities assigned under the constitution, but also such other duties and responsibilities "as may be necessary for the proper conduct of the affairs of the organization and the accomplishments of its objectives." Also, Article 38 provides that the president, "with the approval of the Board of Directors, may take such action as may be deemed necessary to meet situations not covered in this Constitution in order to protect the interest of the membership and the United Transportation Union." This residuum of power is the variable in the constitution that insures that the Union will be able to respond to and, ultimately, survive the threat of unforeseen events affecting the crafts.

This Court rejects plaintiffs' contention that the ratification provisions of Article 85 embody a fundamental right that exists outside the four corners of the constitution and that therefore is superior to it. The constitution is a contract between the Union's members and its leadership. *See United Association of Journeymen & Apprentices of the Plumbing and Pipefitting Industry, etc. v. Local 334*, 452 U.S. 615, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981). The relations between the parties are defined by the constitution's provisions, and are understood only upon review of the document as a whole. This Court concludes, for the reasons set forth above, that the UTU constitution contemplated a responsible as well as responsive leadership, and that the decision-making authority was carefully delegated among the officers and general committees with those concerns in mind.

At most, this lawsuit represents a collision between two facially irreconcilable clauses; happily, the resolution lies in the constitution itself, which elevates the interests of the membership above all other concerns, and vests the power to identify and protect those interests and to deal with the unforeseen, in the office of the president.

It is outside the province of this Court to adjudge the fairness of that delegation or even the wisdom of its exercise. It is not our place to consider whether those interests were satisfied by the Union leadership's decisions aggrieved against by plaintiffs, and by many rank and file members who have written to the Court, or whether a different approach might have attained a greater good. Indeed, in the event that an ambiguity arises, the president is charged with the responsibility of interpreting and enforcing its provisions, as reflected in Article 16 of the constitution as construed in the "forward" which was submitted with its November 1, 1983 revisions. This Court is foreclosed from substituting its construction of the constitution for that of the President, so long as that construction is fair and reasonable. *See Leary v. Western Union Telegraph Company*, 570 F.Supp. 1384, 1387 (S.D.N.Y.1983). Courts have long recognized that all members can never entirely be satisfied by the representation their union leadership provides; thus, the standard of reasonableness that governs fair representation claims is broad and somewhat forgiving. *See Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

Finally, the Court finds plaintiffs' reliance on the Hardin correspondence and

**970**

*Maloof* to be misplaced. Both the letter and the case concerned negotiations with Amtrak regarding the Conrail takeover, which was controlled by statute. In that context, Congress had established a collective bargaining relationship between employer and union member, and Amtrak was obligated to bargain with UTU on the subject of wages, hours and working conditions. Here, in contrast, no such contractual relationship was created, and it is arguable, and was contended by Amtrak, that none existed by operation of other labor statutes in that Amtrak was not as a successor employer as that term is used in connection with the National Labor Relations Act. *See NLRB v. Burns International Security Services,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). Amtrak's plans to reorganize its passenger service and reduce and reconstitute its personnel requirements were urged as suggesting little continuity of identity in the business enterprise. *See Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board, etc.,* 417 U.S. 249, 262–65 & n. 9, 94 S.Ct. 2236, 2243–45 & n. 9, 41 L.Ed.2d 46 (1974). Whatever the correct answer may be to this complex legal issue, the UTU leadership was acting within the discretion and authority conferred on it by the constitution when it decided not to provoke a confrontation with Amtrak over this issue at this time.

In deciding whether UTU breached its duty of fair representation, it is sufficient, and we so find, that the UTU leadership, confronted with ambiguous legal configurations and punishing time constraints, acted reasonably in concluding that the bargaining rights of the numerous committees had not yet attached. The UTU leadership concluded, reasonably, that it must act promptly and aggressively in order to maximize its membership's interests. Because the Union constitution fairly supports the actions taken by President Hardin and the vice presidents, the Court finds no breach of the duty of fair representation and no breach of the constitution itself.

The UTU officials thus having had actual authority to negotiate the Off-Corridor agreement with Amtrak, Amtrak cannot be held liable on the derivative claim.

Plaintiffs' motions for summary judgment and for a preliminary injunction are denied. Defendants' motion for summary judgment is granted. Settle a final judgment on ten (10) days' notice which may contain a stay in order that this Court's temporary restraint imposed on March 11, 1986 shall remain in effect pending appellate finality of that judgment. No costs.

So ordered.