David K. WARNER, et al., Plaintiffs,

v.

McLEAN TRUCKING COMPANY, et al., Defendants.

Civ. A. No. C–1–82–1364.

United States District Court, S.D. Ohio, W.D.

Nov. 22, 1985.

Robert Karl Handelman, Mary J. Kilroy, Handelman & Kilroy, Columbus, Ohio; of counsel: Paul E. Tobias, Cincinnati, Ohio, for plaintiffs.

Robert J. Hollingsworth, Cincinnati, Ohio, Sorrell Logothetis, Dayton, Ohio, Dennis J. Buckley, Cincinnati, Ohio, for defendants.

## MEMORANDUM AND ORDER

DAVID S. PORTER, Senior District Judge:

This is a class action brought by dock workers, yardmen, and city-combination drivers who are members of Local 100, International Brotherhood of Teamsters (IBT), and who are employed by McLean Trucking Company's breakbulk facility in Cincinnati, Ohio. The case involves McLean's implementation of a flexible work week in November 1982 without a vote by the affected employees. Plaintiffs allege that this violated their rights, and they consequently assert breach of contract claims pursuant to section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185 (1982) against McLean, the Ohio Conference of Teamsters [1] (Conference or OCT), and the Ohio Joint State Committee [2] (State Committee or OJSC). Plaintiffs also assert breach of the duty of

---

1. The Ohio Conference of Teamsters is a subordinate body of the International Brotherhood of Teamsters (IBT), deriving its authority from the IBT Constitution, art. XVI (1981). All Ohio teamster local unions are required to affiliate with the Conference. The objectives of the OCT are set forth in article 1, section 2 of the OCT By-laws and include primarily education, public relations, and communications functions. The OCT's activities are narrow and limited by the following provision:

    In the exercise of the Conference of its objectives, it shall not act in the capacity of a local union, nor shall it engage in activities within the ambit of the authority of the local union. The projections of its objectives are and shall be advisory only and shall not be construed as producing an agency posture between the Conference and the locals.

2. The Ohio Joint State Committee is a body created pursuant to article 44, section 2 of the National Master Freight Agreement and the Central States Area Local Cartage Supplement. It is composed of an equal number of union officials, appointed by the Ohio Conference of Teamsters, and of trucking industry representatives, appointed by the Ohio Motor Carriers Labor Relations Association. The State Committee has "jurisdiction over disputes and grievances involving Local Unions or complaints by Local Unions." NMFA Supp.Agreement art. 44, § 2 (1979–1982). Specifically, the State Committee is "to settle disputes which cannot be settled between the Employer and the Local Union." *Id.* at § 5.

fair representation claims against Local 100, the OCT, the OJSC, and the Ohio Highway Drivers' Council[3] (Council or OHDC). In addition, plaintiffs claim that the Conference and the State Committee violated their rights under section 101(a) of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411(a)(1) (1982). Finally, plaintiffs assert a cause of action against McLean for misrepresentation.

This case is now before this Court on defendant McLean's motion for summary judgment (doc. 55), plaintiffs' response thereto (doc. 58), and McLean's reply (doc. 63). After reviewing those documents and all other pleadings in the case, it was determined that judgment could not be rendered for the relief requested, and consequently a hearing pursuant to Federal Rule of Civil Procedure 56(d) was deemed appropriate. That hearing was held July 12, 1985 to "ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted." Fed.R.Civ.P. 56(d). At the hearing representatives of plaintiffs and all defendants appeared and responded to questions from the Court. Following the hearing, all the parties submitted a joint Statement of Stipulated Facts (doc. 72).[4] Those facts, upon which we rely in part for our statement of facts below, are incorporated by reference in this Memorandum as facts "without substantial controversy" which will be deemed established at trial. Other facts which are "actually and in good faith controverted" will be discussed below.

Subsequent to the hearing, defendants Ohio Conference of Teamsters, Ohio Highway Drivers' Council, and Ohio Joint State Committee, (hereinafter collectively "union

defendants") filed a motion for summary judgment (doc. 73) which plaintiffs oppose (doc. 83); the union defendants also filed a reply brief (doc. 85). Defendant Local 100 filed its own motion for summary judgment (doc. 75), to which plaintiffs responded (doc. 81), and Local 100 replied (doc. 82). This memorandum and order will now examine the merits of each of these motions for summary judgment.

A motion for summary judgment should be granted only if there are no issues regarding material facts and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether summary judgment is appropriate, we must construe the facts in the light most favorable to the plaintiffs, as the non-moving parties. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1130 (6th Cir.1976). Moreover, the burden is upon defendant to show their entitlement to summary judgment. Applying this standard to the facts in this case, we conclude that McLean's motion for summary judgment must be denied, while Local 100's should be granted, and the motion of the OCT, OJSC, and OHDC must be denied in part and granted in part.

## I. FACTS

This case centers around a dispute concerning the manner in which McLean Trucking Company instituted a flexible work week in 1982. At that time the trucking industry was undergoing deregulation during a period of general economic recession. Trucking companies were fiercely competitive, causing some to go out of business or to lay off workers. It was important for them to attempt to achieve

---

**3.** The Ohio Highway Drivers' Council is a trade division of the OCT composed of the Ohio Teamster affiliates in the freight industry. Its operations are set forth in the OCT By-laws, article IX, section 1 as follows:

It is recognized that the Trade Division known as the Ohio Highway Drivers' Council operates differently from other divisions, in that regular monthly meetings are held at which decisions are reached and determinations are made at State levels in conjunction with em-

ployer committee, regarding contract interpretations pertaining to grievances filed by local Unions at the State level; all of which is duly provided for in area of national collective bargaining agreements, including grievances and appeals procedures provided thereon.

**4.** Subsequent references to exhibits refer to exhibits to doc. 72 unless otherwise noted.

the most advantageous treatment possible in their negotiations with local unions. One goal for these trucking companies was the institution of an unlimited flexible work week. The purpose of instituting a flexible work week was to allow the trucking company to have seven different weekly work schedules, each beginning on a different day of the week. This permits the company to work a greater number of employees more hours without having to pay overtime. From the point of view of the trucking company, therefore, this was desirable because it permitted them to increase productivity at a minimal cost. From the point of view of organized labor this could also be considered advantageous because the result could be an increase in the total number of persons employed. For employees who were already working at the trucking companies, however, the seven-day flexible work week was not desirable because it diminished their opportunity for overtime pay.

During the relevant time period for this case, McLean Trucking Company and Local 100 were signatories to a multi-employer collective bargaining agreement, the National Master Freight Agreement and Central States Area Local Supplemental Agreement (NMFA). The NMFA became effective on April 1, 1982 following ratification by the membership of Local 100. Article 61 of the NMFA provided for a standard work week of five consecutive days, beginning Monday or Tuesday. Work weeks starting on other days, called flexible weeks, could be established at break-bulk terminals upon (1) the employer's notice, and (2) fulfilling "certain mutually agreed to standards." NMFA, art. 61, § 1. The NMFA did not specify what these standards should be, but it did provide that "any such agreed-to procedure" must be submitted for approval by the Central States Joint Area Rider Committee. Thus, the requirements for instituting a flexible work week are established by riders to the NMFA that may be negotiated between locals and employers.

At the time the 1982–85 NMFA was ratified, a document entitled "Guidelines for Operation of Flexible Work Week" established the "mutually agreed-to procedures" for deviations from the standard work week specified in the NMFA (Exhibit C to doc. 58). These Guidelines were agreed to by the Ohio Highway Drivers' Council, representing the Ohio teamster union locals, and the Ohio Motor Carriers Labor Relations Association, representing the trucking companies covered by the NMFA (including defendant McLean). Article 7 of the Guidelines, titled "Implementation" set forth three prerequisites for the implementation of a flexible work week: (1) approval by the local union, (2) approval by a majority of the affected employees, and (3) the sanction of the Ohio Joint State Committee.

Pursuant to these Guidelines, McLean and Local 100 had entered into the McLean Breakbulk Agreement which established that the work week at McLean could begin on Thursdays in addition to Mondays and Tuesdays as provided in the 1979–82 NMFA. This agreement thus permitted the McLean breakbulk facility to operate seven days a week. As required by the Guidelines, the McLean Breakbulk Agreement was ratified by a secret ballot vote of the affected employees, and it became effective in September 1981. Other trucking companies in Ohio had different provisions for their flexible work weeks. For example, in November 1981 Lee Way Motor Freight and Local 100 agreed that they would operate under a plan calling for work weeks starting all seven days of the week.

Thus, the system in operation under the 1979–82 NMFA and applicable flexible work week Guidelines authorized negotiation between locals and employers to determine what if any deviation from the standard work week would govern their relationship. It is undisputed that under these procedures the affected employees were entitled to vote on such a plan, which then had to be approved by the local union and the Ohio Joint State Committee.

For existing riders such as the Guidelines or the Breakbulk Agreement to re-

main in effect following the adoption of the 1982–85 NMFA they had to be submitted to the appropriate Joint Area Committee as required by article 2, section 5(a) of the NMFA. Failure to do so would render them "null and void." NMFA, art. 2, § 5(a). Instead of submitting the existing flexible week riders for approval, however, the Presidents and Secretary-Treasurers of the Teamsters Freight Locals in Ohio met in Columbus on March 30, 1982, and voted unanimously to authorize the Ohio Conference of Teamsters, acting through the Ohio Highway Drivers' Council, to renegotiate the Guidelines for the Flexible Work Week. At the same meeting a motion was made and seconded that a state-wide work week be adopted.

The negotiation of a new set of guidelines during the term of the 1982–85 NMFA was governed by article 2, section 5(b) of the NMFA which required that such new riders must be approved by the Joint Area Committee. Once such a new rider was approved, the NMFA provided that it "shall be made available, if requested, to all Employers similarly situated in the geographic area to which the Riders apply." NMFA, art. 2, § 5(c). This provision is the so-called "most favored nation" clause which McLean claims entitled them to implement the flexible work week unilaterally once another employer in the area had done so.

As a result of the motion passed at the March 30, 1982 meeting, the negotiating committees of the Ohio Motor Carriers Labor Relations Association and the Ohio Highway Drivers' Council formulated guidelines for the implementation of a uniform flexible work week in Ohio. Sometimes referred to as the Ohio Flexible Work Week Rider, these guidelines were submitted to and approved by the Ohio Joint State Committee in May 1982. They were then submitted to and approved by the Central States Joint Area Committee in June 1982. The only substantive change made in the new guidelines was in article 7 concerning implementation. The requirement that the majority of the affected employees approve the implementation of the flexible work week was deleted. In its place was the condition that, "Upon approval by the Central States Joint Area Committee this Rider becomes available to any Ohio domiciled Company which meets the criteria set forth herein. Any dispute shall be submitted to the Grievance Procedure" (Exhibit D). The requirement that the local union must approve the implementation of a flexible work week with starting days other than Monday or Tuesday was retained.

The members of Local 100 who are plaintiffs in this case never voted on these new guidelines; nor did Local 100 ever approve them after they were drafted. Although the NMFA expressly requires only that new riders be approved by the Joint Area Committee, the International Brotherhood of Teamsters (IBT) Constitution does require employee approval of any amendment or rider to the NMFA. Specifically it states: "If amendments to local or area supplements or riders to the Master Agreement are voluntarily negotiated during the term of such Agreement, such amendments must be approved by secret ballot majority vote of the affected members." IBT Const., art. XVI, § 4(a) ¶ 4. The By-laws of Local 100 also contain such a voting requirement.

Following the approval of the new guidelines by the OJSC, some Ohio trucking companies sought and received approval from the OJSC to implement the seven day start flexible work week outlined in the guidelines. McLean requested OJSC permission to implement the seven day flexible work week, pursuant to article 7 of the Guidelines which requires OJSC sanction. A hearing was initially set for August 1982. The hearing was continued to October 14, 1982, however, because the request for approval of the flexible work week had been submitted to the docket late; Local 100's request for a continuance was therefore automatically granted. Local 100 and its members opposed McLean's request, and they even sought to remove the matter from the OJSC's October docket (Exhibit

M). Nonetheless the hearing was held as scheduled.

At the hearing, Local 100 steward David Warner and business representative Michael Connelly argued that the affected employees were entitled to vote on and approve the implementation of any new flexible work week that deviated from the one established by the 1981 McLean Breakbulk Agreement. The OJSC Grievance Committee unanimously held that, "The Local Union and the Employer are instructed to comply with the negotiated OJSC Flex work week approved by the Central States Joint Area Committee for uniform application throughout the States (sic) of Ohio" (Exhibit E).

On the same day the OJSC issued an identical decision in another case involving the Ohio flexible work week (Exhibit H). In that case, Lee Way Motor Freight opposed abandoning the flexible work week it had negotiated with Local 100 in 1981 in favor of the provisions of the new guidelines. Although both the 1981 Lee Way agreement and the 1982 Ohio flexible week plans permitted work weeks to start any day of the week, they differed in other significant ways. Thus, the OJSC ruling that they must comply with the plan mandated compliance with all of the provisions of the Ohio flexible work week plan, not just those concerning the permissible days for work week starts.

Following the OJSC decision, David Warner, a plaintiff in this case who was also steward at McLean Trucking, was informed by Local 100 President Kiser that the decisions of the OJSC were final and binding and that consequently no further intra-union remedy was available. Nonetheless, members of Local 100 continued to oppose the implementation of the Ohio flexible work week by communicating directly with McLean (Exhibit P) and by retaining counsel to pursue civil remedies against McLean (Exhibit Q). Despite these attempts to dissuade McLean, the Ohio flexible work week was implemented at McLean's Cincinnati terminal on November 22, 1982. On that same day plaintiffs instituted this suit.

Plaintiffs' first amended complaint (doc. 6), filed December 13, 1982, set forth eight causes of action, briefly summarized as follows:

1. Breach of contract by defendant McLean.
2. Breach of the duty of fair representation by defendant Ohio Conference of Teamsters.
3. Breach of contract and breach of duty of fair representation by Ohio Highway Drivers' Council.
4. Breach of contract by Ohio Joint State Committee.
5. Breach of duty of fair representation by defendant McLean through its actions in conjunction with the union defendants.
6. Breach of duty of fair representation by defendant Local 100.
7. Denial of right to vote by the OCT and the OJSC in violation of section 411 of the Labor Management Reporting and Disclosure Act, 29 U.S.C. 411 (1982).
8. Misrepresentation by defendant McLean.

Plaintiffs sought injunctive and declaratory relief, compensatory damages, punitive damages, attorneys' fee, and the vacation of the OJSC's October 14, 1982 order.

## II. McLEAN'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs contend that McLean's implementation of a new flexible work week in 1982 without a vote by the affected employees constituted a breach of contract within the meaning of 29 U.S.C. § 185 (1982). Specifically, plaintiffs claim that McLean breached article 61 of the NMFA as well as the 1981 McLean Breakbulk Agreement. Moreover, if the Ohio Flexible Work Week Rider is a valid rider which has supplanted the pre-existing Guidelines and the McLean Breakbulk Agreement, plaintiffs contend that McLean breached that Rider by failing to follow its implementation clause which required approval by the

local. Plaintiffs also argue that McLean violated articles 44 and 45 of the NMFA by failing to request the new flexible work week at the local level first. Finally, plaintiffs charge McLean with misrepresentation and bad faith in negotiating the 1982 McLean Breakbulk Agreement, as well as breach of the duty of fair representation through McLean's cooperation with the various union defendants.

█ McLean's motion for summary judgment is directed primarily at plaintiffs' first cause of action alleging breach of contract which is the only issue we will address. McLean asserts that there was no breach of contract because employee ratification was not required either under the labor contract or under the union constitution. McLean contends that they were entitled to establish a flexible work week without a vote of their employees by either of two procedures. First, McLean claims they could establish the flexible work week by satisfying the applicable OJSC guidelines established under article 61 of the NMFA; second they contend that operation of article 2, section 5(c) of the NMFA by itself gave them a right to implement unilaterally a flexible work week rider identical to that established by any other employer in compliance with the OJSC guidelines. We disagree, however, because we conclude that McLean has not shown that it complied with the applicable article 61 guidelines. In addition, we have determined as a matter of law that article 2, section 5(c) of the NMFA does not by itself permit the unilateral implementation of a new flexible work week. Therefore we cannot conclude that there was no breach of contract, and McLean's motion for summary judgment as to the plaintiffs' first cause of action must be denied.

### (1) Compliance With Flexible Work Week Guidelines

McLean has not shown that it complied with the applicable guidelines for implementation of a new flexible work week. The NMFA that went into effect in 1982 established a standard nation-wide work week, with the possibility of altering that work week by following certain "mutually agreed to standards." NMFA, art. 61. We do agree with McLean that both the old Guidelines and the 1981 McLean Breakbulk Agreement were "null and void" riders to the NMFA unless they were submitted to the appropriate Joint Area Committee within 90 days of ratification as required by article 2, section 5(a) of the NMFA. Plaintiffs have made no assertion that the old agreements were so submitted, and lacking such evidence we must conclude that those documents were no longer operative by July 1982. Even if these documents were null and void, however, McLean was not thereby freed from all restraints in its attempt to implement a different flexible work week. McLean was still required to comply with the standards embodied in the Ohio Flexible Work Week Rider, if it in fact was a valid rider to the 1982–85 NMFA.

We have examined the question of the Rider's validity, and we conclude on the record now before us that the Ohio Flexible Work Week Rider was a valid rider because it was adopted in compliance with the requirements of article 2, section 5(b) of the NMFA. That section requires only the approval of the Joint Area Committee. Since this Rider was negotiated during the term of the NMFA, pursuant to a unanimous vote of the Teamster Local Presidents and Secretary-Treasurers on March 30, 1982, and it was approved by the Joint Area Committee, we find that it did comply with those terms of the NMFA.

Plaintiffs contend, however, that the Rider is not valid because it was not approved by a secret ballot majority vote of the affected employees as required by article XVI, section 4(a) of the International Brotherhood of Teamsters Constitution. Although a "union constitution may be fairly characterized as a contract between labor organizations," *United Association of Journeymen v. Local 334 United Association of Journeymen*, 452 U.S. 615, 619, 101 S.Ct. 2546, 2548, 69 L.Ed.2d 280 (1981), we cannot conclude on the record now before us that this "contract" was binding on the

employers so that a violation of the IBT Constitution would have invalidated the Ohio Flexible Work Week Rider. There is no evidence on the record that the IBT constitutional provisions have been incorporated either explicitly or implicitly into the NMFA. Nor have plaintiffs alleged or shown that the Ohio Motor Carriers Labor Relations Association was ever notified that the rider which they were negotiating would be subject to any ratification procedure outside of the NMFA itself. Nor do the plaintiffs produce any evidence that the employers' representatives should have known that the agreement would be subject to a vote by the affected employees. Unless such evidence is produced at trial, we would conclude that the IBT constitutional provisions requiring a vote by affected employees is not binding upon the employer signatories to the NMFA so as to invalidate a rider to the NMFA which was negotiated in good faith.

If the Ohio Flexible Work Week Rider was a valid rider, it was binding on McLean. Contrary to McLean's assertion, it is clear that McLean did not comply with the implementation clause of the Rider. Article 7 of that Rider specifically requires approval by the local union. It is undisputed, however, that Local 100 opposed the implementation of a different work week at McLean's breakbulk facility in Cincinnati, and that they never expressly approved such implementation. Although McLean contends that the Locals' approval was given at the March 30, 1982 meeting when Local 100's President Gairald Kiser joined in the unanimous vote authorizing the negotiation of a uniform flexible work week, they offer no evidence of that fact. Apparently they believe that such is the most reasonable inference to draw from that authorization. We do not agree.

██ Moreover, there is evidence on the record that disputes McLean's interpretation. Local 100 President Kiser does not concur in such a view of that vote. Referring to the vote, he has stated, "It would be impossible for ... [us] ... to vote on something that was non-existent. You don't sign a blank check and give it away and tell them to fill it in." Transcript of Hearing, Dec. 21, 1982, at 46. Harold Leu, President of Local 20, has also indicated that in his mind he did not give the OCT authority to eliminate the requirement for rank and file ratification. Deposition of Harold D. Leu, at 18. In fact, Leu recalled that "there was going to be some communications back to those Local Unions that were having the problems ... —they were going to have input in putting one together." *Id.* at 19. In light of the fact that McLean has produced no evidence contradicting these views of the March 30, 1982 vote, we cannot conclude that the locals approved the rider prior to its negotiation. We must interpret these statements in the light most favorable to the nonmoving party for the purpose of this motion, and we therefore conclude that by the local presidents' express approval of the new flexible work week plan has not been demonstrated. Thus article 7's requirement of local union approval was not met by McLean.

### (2) The "Most Favored Nation" Clause

McLean's second contention is that they were entitled to implement a new flexible week by operation of article 2, section 5(c) of the NMFA, which states: "Approved conditions of Riders shall be made available, if requested, to all Employers similarly situated in the geographic area to which the Riders apply and to the type of operation which is specifically covered by the Riders." According to McLean, this section was intended to permit each employer in the multi-employer group to adopt procedures in effect at other employer's facilities.

Although we agree that this was probably the general intent of the provision, we cannot agree that the provision dispenses with all other procedural requirements for effecting such changes. Article 2, section 5(c) is not self-executing. It refers specifically to the implementation of those conditions of riders that have been approved. Although this section does not specify exactly who must have approved these condi-

tions, the context suggests that it must be approved by the Joint State Committee, as required by article 2, section 5(b). We do not think, however, that compliance with article 2, section 5(b) will necessarily be all that is required. Instead we conclude that the terms of the riders must have been approved as required by any and all other relevant provisions of the NMFA. For riders establishing a flexible work week other than the standard one, therefore, the "mutually agreed to standards" mentioned in article 61 must also be followed. Thus, we agree with plaintiffs that article 2 must be read in tandem with article 61 or any other relevant provision of the NMFA.

As we have already stated above, the "mutually agreed to standards" in effect at the relevant time for this case were arguably those negotiated and approved in 1982, known at the Ohio Flexible Work Week Rider. Those guidelines contained an implementation clause which mandated approval of the local union prior to their implementation. Thus, an employer could not unilaterally implement the guidelines just because another employer had negotiated and implemented a flexible work week in conformance with the standards. Instead, the guidelines themselves, including their procedure for implementation, was available to all similarly situated employers.

Thus we conclude that the Guidelines for a Flexible Work Week promulgated pursuant to article 61 are a rider to the NMFA which, if properly approved pursuant to their own internal implementation procedures, becomes available to employers under article 2, section 5(c). As we have already discussed above, McLean has not shown that they complied with the implementation provisions of the Ohio Flexible Work Week Rider. If that is the case, McLean was not entitled to implement a new flexible work week merely by invoking the authority of article 2, section 5(c).

In summary, we conclude that McLean's motion for summary judgment as to the breach of contract claims must be denied. We do not state any opinion as to any other of the claims against McLean. We also conclude that there continues to be controversy concerning some material facts, such as:

(1) Whether the IBT constitutional provisions are implicitly or explicitly incorporated into the NMFA so as to be binding on employers who are signatories to the NMFA, such as McLean.

(2) Whether the Ohio Motor Carriers Labor Relations Association (OMCLRA) was ever notified that the rider concerning guidelines for the flexible work week that they negotiated would be subject to any ratification procedure outside the NMFA itself.

(3) Whether employers' representatives of OMCLRA should have known that the agreement would be subject to a vote by the affected employees.

(4) Whether Local 100 approved the Ohio Flexible Work Week Rider when its President and Secretary-Treasurer voted to authorize the negotiation of a flexible work week rider.

## III. LOCAL 100's MOTION FOR SUMMARY JUDGMENT

Plaintiffs allege that Local 100 breached its duty of fair representation to them by failing to do more to ensure that the Local members be allowed to vote on McLean's new flexible work week plan. Specifically plaintiffs' sixth cause of action alleges that Local 100 should have filed a grievance or protested the OJSC's unanimous decision permitting McLean to implement the plan. Further, plaintiffs charge that Local 100 should have taken some court action to set the OJSC decision aside. Local 100 objects to these claims, stating that it did all that it was legally able or required to do. After reviewing the relevant law and the facts, construed in the light most favorable to the plaintiffs, we conclude that there was no breach of the duty of fair representation by Local 100 and we consequently grant Local 100's motion for summary judgment as to plaintiffs' sixth cause of action.

A union owes the members it represents a duty of fair representation. This means

that the union's treatment of its members may not be "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). A court should inquire whether there is evidence of "hostility to any," *Ford Motor Co. v. Huffman,* 345 U.S. 330, 337, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), or whether the union's representation is either "indifferent to the rights of members" or "grossly deficient." *Wyatt v. Interstate & Ocean Transportation Co.,* 623 F.2d 888, 891 (4th Cir.1980).

■■■ This standard leaves a wide area of discretion to the union. Although the union may be found to have breached its duty if it "arbitrarily ignores or perfunctorily processes a grievance," *Miller v. Gateway Transportation Co.,* 616 F.2d 272, 277 n. 11 (7th Cir.1980), "[m]ere negligence, poor judgment or ineptitude are insufficient." *NLRB v. American Postal Workers Union,* 618 F.2d 1249, 1255 (8th Cir. 1980). Therefore we must determine whether Local 100 breached its duty of fair representation by acting in an arbitrary, discriminatory or bad faith manner towards any segment of its membership. Only if we find "substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives," *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473, *reh'g denied,* 404 U.S. 874, 92 S.Ct. 24, 30 L.Ed.2d 120 (1971), may we conclude there has been such a breach. Mere "conclusory allegations of discrimination are insufficient" to maintain a claim of breach of the duty of fair representation. *Whitten v. Anchor Motor Freight, Inc.,* 521 F.2d 1335, 1341 (6th Cir.1975), *cert. denied,* 425 U.S. 981, 96 S.Ct. 2188, 48 L.Ed.2d 807 (1976).

■■■ We find that the plaintiffs in this case have failed to put forward *any* evidence of such arbitrariness or bad faith. On the contrary, we find that the record before us contains substantial evidence of Local 100's repeated, diligent, and good faith efforts to prevent McLean from implementing the new flexible work week

without a vote by the affected employees. The Statement of Stipulated Facts and its accompanying exhibits show that Local 100 repeatedly attempted to prevent the implementation of the new flexible work week. Local 100's President Gairald F. Kiser sent a letter opposing the change to Noble Jackson, a labor relations specialist of McLean; he also attempted to secure the assistance of the Teamsters' General President, Roy Willams, and the Ohio Conference of Teamsters President, Jackie Presser Exhibits J, K, L, M, M–1, O). Local 100 also requested and secured a continuance of the OJSC hearing on McLean's request Exhibits N & O), and one of Local 100's business representatives, Michael Connelly, appeared at the OJSC hearing to oppose McLean's request.

Following the OJSC's decision, Local 100 admittedly took no further steps to protest or vacate the OJSC decision. In fact, it is undisputed that Local 100's President told steward David Warner that the OJSC's decision was final and binding, and that there was nothing further that the union could do to change the decision (doc. 72, ¶ 19). Local 100 believed that there was no further appeal possible because article 45, section 1(c) of the Supplemental Agreement, which is part of the NMFA, so states, as follows: "Where a Joint State Cartage Committee, by a majority vote, settles a dispute, no appeal may be taken to the Joint Area Cartage Committee. Such decision will be final and binding on both parties."

The NMFA permits a Local to appeal to the National Grievance Committee only if the Supplemental Agreement's grievance procedure is deadlocked. NMFA, art. 8, § 1(a). Since the OJSC had reached a unanimous decision in this case this procedure was not available. Plaintiffs apparently believe that the Local could still do something, but they provide no evidence of a particular procedure, nor any evidence that the Local knew of any alternative procedure and intentionally chose to ignore it. Lacking such evidence, we conclude that Local 100's assertion that there was no

further appeal possible was a good faith assertion, and not a violation of the duty of fair representation.

Plaintiffs contend that if, in fact, there was no possibility of further appeal, Local 100 should have attempted to set aside the OJSC decision by court action pursuant to 9 U.S.C. § 10 (1982). Certainly Local 100 could have pursued such an action, and it probably would have been prudent for them to do so. Local 100 contends, however, that such an action would have been fruitless, something which we cannot decide on the record now before us. But we can and do conclude that Local 100's failure to take such an action is not the kind of negligence or perfunctory handling of a grievance that constitutes a breach of the duty of fair representation.

Nor was Local 100 obligated by its duty of fair representation to file internal union charges. Although Local 100 could have done so, neither federal law nor the IBT Constitution requires the Local to do so. Article XIX of the IBT Constitution sets forth procedures which permit any union member to file charges against other members, officers, locals or Joint Councils. Perhaps it would have been best if the Local had done this on behalf of its members or at least encouraged them to do so. But plaintiffs have produced no evidence that the Local's failure to do so was arbitrary or in bad faith. Moreover, plaintiffs admit that they themselves did not file such charges because they believed it would be futile. Therefore the union's failure to do so was clearly not so egregious as to constitute a breach of the duty of fair representation.

Plaintiffs have supplied no evidence whatsoever that Local 100's failure to take further action to oppose the new flexible work week or its implementation without a vote by the affected employees was in bad faith. In fact, when plaintiff Warner was asked whether he had "any reason to believe that they [Local 100] weren't being straight with you" when they told him there was nothing more they could do, he replied no. Deposition of David Warner, at 30.

Finally, we do not find that Local 100 breached the duty of fair representation by voting to authorize the negotiation of a new state-wide flexible work week at the March 30, 1982 meeting. As we have already noted, Local 100 President Kiser has stated that his vote at that time did not constitute the surrender of the Local's or the members' right to approve the product of that negotiation. Although we have noted above that McLean contends that Local 100 did approve the flexible work week at the March 30, 1982 meeting, they have not supplied any concrete evidence of that. Thus, on this record we can only conclude that the local officials authorized the negotiation of new guidelines at that meeting. This grant of authority does not constitute a breach of Local 100's duty of fair representation by itself. It would only constitute a breach of their duty of fair representation unless it can be proven that it was done arbitrarily or in bad faith. It is possible that the locals knew that the OCT planned to do something to "take the heat off" the locals whose members refused to consent to an expanded flexible work week. Plaintiffs have not alleged this, nor have they provided any evidence supportive of such a theory despite extensive opportunity for discovery. Absent some express admission of bad faith or some documentary proof that has somehow gone undetected despite the lengthy discovery in this case, we can conceive of no evidence that plaintiffs could still produce to substantiate such bad faith. On the facts before us, and in the absence of *any* concrete contradictory evidence from plaintiffs, we cannot see any foundation for a claim that Local 100 committed a breach of its duty of fair representation at the March 30, 1982 meeting.

Plaintiffs assert that even if Local 100 did not itself breach its duty of fair representation, that it is nonetheless liable for the alleged wrongful acts of the OCT under an agency theory. We disagree. Such a claim is nowhere in plaintiffs'

amended complaint. Even if it were, however, we would conclude that plaintiffs have not shown that an agency relationship existed or that the OCT acted within the scope of its alleged agency. Although it is undisputed that Local 100 voted to authorize the OCT to negotiate a new set of guidelines, plaintiffs have failed to show that Local 100 delegated authority to create an agreement that would eliminate the requirement of employee ratification prior to implementation. Moreover, even if the OCT were an agent of Local 100, it is clear that the OCT's actions went beyond the scope of whatever authority may have been delegated. Local 100's actions following the approval of the new guidelines clearly supports this view. Moreover, there is simply no evidence that Local 100 authorized the deletion of the employee ratification. Consequently, we simply cannot see how Local 100 can be held responsible for the alleged wrongful acts of the OCT.

Thus we can find no evidence that any aspect of Local 100's behavior in this entire series of events was arbitrary, discriminatory or in bad faith so as to constitute a breach of their duty of fair representation. Even viewing the facts in the light most favorable to the plaintiffs, we can find, at most, nothing more than possible negligence, lack of initiative, or mistake of judgment on the part of Local 100 which is clearly insufficient to support plaintiffs' claims. Consequently, we deem it appropriate to grant defendant Local 100's motion for summary judgment as to plaintiffs' claims of a breach of the duty of fair representation.

Plaintiffs contend that Local 100's motion for summary judgment has failed to address their claims that Local 100 violated section 101 of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a), and that Local 100 breached its contractual obligations under the IBT Constitution and the Local By-laws. None of these claims are contained in plaintiffs' amended complaint and we will not entertain them now. Consequently, there are no remaining claims against Local 100 in this case.

## IV. MOTION FOR SUMMARY JUDGMENT OF OCT, OHDC, AND OJSC

Plaintiffs assert a variety of claims against these union defendants. First, they allege that the OCT and OHDC breached their duty of fair representation to plaintiffs by failing to oversee and enforce the plaintiffs' contractual rights under the NMFA, its supplements, and riders. Second, they assert that the OCT, OHDC, and the OJSC breached their contractual duties to plaintiffs under the International Brotherhood of Teamsters Constitution, (especially art. XVI, § 4(b), ¶ 4) and the NMFA (especially articles 44 and 45), all in violation of section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1982). Third, plaintiffs claim that the OCT and the OJSC denied them their right to vote as guaranteed under section 101 of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(1) (1982), by sanctioning the implementation of the unlimited flexible work week at McLean Trucking Company without a vote by the affected employees. Defendants raise a number of different legal arguments in support of their motion for summary judgment as to these claims, some of which are well-taken.

### A. *Section 301 Jurisdiction Over Defendant Unions*

Defendants contend that this Court has no section 301 jurisdiction over them for the breach of contract and the breach of duty of fair representation claims because they believe there has been no breach of a contract "between … an employer and a labor organization" or "between labor organizations" as required by section 301. 29 U.S.C. § 185(a) (1982). First, defendants claim that they cannot be liable for the breach of any contractual duties under the NMFA because they are not signatories to it. Second, they deny that McLean has breached the NMFA or its supplements or riders, so they contend that they cannot be prosecuted for a breach of the duty of fair

representation under section 301. Third, they submit that this Court has no jurisdiction over any alleged breach by them of the IBT Constitution or the OCT By-laws because those documents are not contracts "between ... labor organizations" within the meaning of section 301.

### (1) *Jurisdiction Over Claims of Breach of NMFA Contractual Duties.*

■ We will first consider whether we have jurisdiction over these union defendants for their alleged breach of the NMFA. Defendants contend that they are not signatories to the NMFA and that they cannot be held liable for a contract to which they are not a party. It is true that neither the OCT, the OHDC, nor the OJSC are signatories to the NMFA or its Supplemental Agreement. Nonetheless, we believe that we have section 301 jurisdiction over these union defendants for determination of their liability for breach of the NMFA for two reasons.

First, it is undisputed that the OHDC's negotiating committee, on behalf of the OCT and pursuant to a motion of the locals, assisted in formulating the Ohio Flexible Work Week Rider to the NMFA. OHDC Chairman Richard Cassidy even signed that agreement on behalf of the OHDC. Moreover, that agreement was then approved by the OJSC whose name appears at the top of the Rider. Given this background, we cannot agree that the OJSC, the OCT, and the OHDC were not parties to the NMFA because they are parties to a crucial rider to the NMFA, having negotiated, approved, and signed it. In fact, it is this Rider and the alleged noncompliance with it by McLean and the union defendants that is at the heart of plaintiffs' allegations in this case.

Second, even if the OCT, OHDC, and OJSC were not parties to a rider to the NMFA, there is still a basis for section 301 jurisdiction over them because their rights and duties are set forth in the NMFA. The traditional rule in the Sixth Circuit has been that section 301 "creates federal jurisdiction only over parties to the contract being sued upon." *Metropolitan Detroit Bricklayers District Council v. J.E. Hoetger & Co.*, 672 F.2d 580, 583 (6th Cir.1982). The Sixth Circuit has recently implied that subject matter jurisdiction might also be found over a non-signatory whose "rights or duties ... are stated in the terms and conditions of the contract." *Service Employees Union, Local 47 v. Commercial Property Services, Inc.*, 755 F.2d 499, 506 (6th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985). In the case now before us, the OCT and OJSC both have some of their duties set forth in the NMFA. Articles 44 and 45 of the NMFA outline the responsibilities and duties of the OJSC, while article 8, section 2 and article 20 set forth the duties and responsibilities of the "Area Conferences," which in Ohio is the OCT. Thus, we conclude that section 301 jurisdiction over the OCT, its subdivision the OHDC, and the OJSC is established due to the fact that their jurisdiction and duties are spelled out in the NMFA, which is a contract between an employer and a labor organization.

### (2) *Jurisdiction Over Breach of Duty of Fair Representation Claims.*

Next, we must consider whether this Court has section 301 jurisdiction over plaintiffs' claims of breach of the duty of fair representation. Defendants claim that there can only be such jurisdiction if there has been a breach of a collective bargaining agreement by an employer, which they assert did not occur in this case. As we have already stated above, we cannot now say as a matter of law that there has been no breach of contract by McLean. Thus, even if we were to agree that section 301 jurisdiction requires such a breach, we cannot now conclude that the requisite breach is lacking.

### (3) *Jurisdiction Over Breach of Union Constitution Claims.*

■ We must next determine whether we have jurisdiction under section 301 over plaintiffs' claims that the OCT and OJSC breached the IBT Constitution and the OCT

By-laws. Defendants contend that the plaintiffs in this case lack standing because section 301 grants subject matter jurisdiction only over "suits for violations of contracts ... between ... labor organizations." 29 U.S.C. § 185(a) (1982). Since plaintiffs in this case are not labor organizations, defendants claim they may not sue a labor organization for breach of contract under section 301. We agree.

The Supreme Court has held that a union member may sue his employer for breach of a collective bargaining agreement under section 301. *Smith v. Evening News Association*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). The Supreme Court has also concluded that labor organizations may sue each other under section 301 for violations of a union constitution because a union constitution is a contract within the meaning of section 301. *United Association of Journeymen v. Local 334 United Association of Journeymen*, 452 U.S. 615, 627, 101 S.Ct. 2546, 2553, 69 L.Ed.2d 280 (1981). But the Supreme Court has expressly reserved the question of whether an individual union member may sue a labor organization on a union constitution under section 301. *Id.* at 627 n. 16, 101 S.Ct. at 2553 n. 16.

In *Journeymen* the Supreme Court noted, but did not over-rule, a Sixth Circuit case in which the court declined to find that there was section 301 jurisdiction for individual union members to sue a labor organization on a union constitution. *Trail v. International Brotherhood of Teamsters*, 542 F.2d 961 (6th Cir.1976). The Sixth Circuit's decision was based on the court's reluctance to interfere in the union's internal affairs, as well as the fact that the plaintiffs had other remedies available which had been specifically designed for claims such as theirs. *Id.* at 968.

Plaintiffs argue that the theoretical underpinnings of *Trail* were undercut by the Supreme Court's holding in *Journeymen* that a union constitution is a contract between labor organizations within the meaning of section 301. In support of their position, plaintiffs recite the Court's language to the effect that "it is far too late in the day to deny that Congress intended the federal courts to enjoy wide-ranging authority to enforce labor contracts under § 301." 452 U.S. at 627, 101 S.Ct. at 2553. According to plaintiffs, this language demonstrates the Supreme Court's rejection of judicial non-interference in internal union affairs. Although we do agree that the Supreme Court found that there is a congressional intent for federal courts to exercise broad authority over labor contracts under section 301, we do not think that undercuts the rationale of *Trail*. *Trail* was premised at least in part on the fact that Congress had established distinct remedial procedures for enforcing a union members' rights against the union through the enactment of the "Workers Bill of Rights," 29 U.S.C. § 411(a)(1) (1982). That rationale is particularly relevant in the case now before us because plaintiffs have indeed also sued the union defendants for denial of their voting rights under section 101.

We are aware that some other courts have chosen to construe section 301 broadly so as to find section 301 subject matter jurisdiction over a union member's claim regarding breach of a union constitutions. *See, e.g., Kinney v. International Brotherhood of Electrical Workers*, 669 F.2d 1222 (9th Cir.1982); *Abrams v. Carrier Corp.*, 434 F.2d 1234 (2d Cir.1970), *cert. denied sub nom. United Steelworkers of America v. Abrams*, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971), *Legutko v. Local 816, International Brotherhood of Teamsters*, 606 F.Supp. 352, 356–57 (E.D.N.Y.1985); *Gordon v. Winpisinger*, 581 F.Supp. 234, 239 (E.D.N.Y.1984); *Alford v. National Post Office Mail Handlers*, 576 F.Supp. 278, 282–85 (E.D.Mo. 1983); *Doby v. Safeway Stores, Inc.*, 523 F.Supp. 1162, 1166 (E.D.Va.1981).

Nonetheless, even if we agreed that that is the proper interpretation of section 301, we believe that we are bound by *Trail* which is still the law in the Sixth Circuit. *See, e.g., Frenza v. Sheet Metal Workers' International Association*, 567 F.Supp.

580, 584–85 (E.D.Mich.1983); *Wade v. Teamsters Local 247*, 527 F.Supp. 1169, 1176 (E.D.Mich.1981); *Lawrence v. Utility Workers Union of America, Local 126*, 509 F.Supp. 1151, 1161 (N.D.Ohio 1981); *Cehaich v. International Union, U.A.W.*, 496 F.Supp. 912, 920–21 (E.D.Mich.1980), *aff'd*, 710 F.2d 234 (6th Cir.1983).

We therefore grant defendant OCT's and OJSC's motion for summary judgment regarding plaintiffs' section 301 breach of the IBT Constitution and OCT By-laws claims. We recognize that we may retain jurisdiction over these breach of contract claims through our jurisdiction over pendent state law claims. We decline to do so, however, because we believe that plaintiffs have an adequate alternative avenue for pursuing these claims in their section 411 action.

### B. *Breach of Duty of Fair Representation*

#### (1) *Proper Parties.*

■ Defendants OCT and OHDC contend that they are entitled to summary judgment on plaintiffs' claim of breach of the duty of fair representation because they are not plaintiffs' statutory bargaining representatives, and therefore owed them no such duty. We disagree. Although it is true that collective bargaining representatives may be proper party defendants for such fair representation claims, that does not mean that an employee's local union is the only proper defendant in such an action. Other labor organizations may also be proper defendants if they undertake to negotiate with employers or to bind employees to a contract with employers because by so doing they are functioning as bargaining representatives for those employees.

In this case it is undisputed that the OCT acting through its subdivision the OHDC, negotiated, signed, and implemented a rider to the NMFA which purported to bind plaintiffs to a contract with their employer. Moreover, it is undisputed that the OCT undertook this negotiation pursuant to a unanimous motion by local union representatives. Although we recognize that this negotiation may have been an *ultra vires* act by the OCT, that is not determinative of whether a duty of fair representation is owed. Even if they should not have engaged in these representational acts, the record is clear that they did. By negotiating the Ohio Flexible Work Week Rider we find that the OHDC and the OCT thereby acted as bargaining representatives of the plaintiffs to whom they consequently owed a duty of fair representation.

Moreover we find that the OCT representatives did owe plaintiffs such a duty even when sitting on the OJSC. Although the union members on the OJSC do not usually act in a representational capacity since the OJSC is authorized by the NMFA to perform arbitral functions, this does not mean that the members of the OJSC are in fact always and necessarily acting in an arbitral capacity. We persist in our view, stated over two years ago, that when the OJSC approved the new Guidelines for a Flexible Work Week it:

> acted in a capacity akin to that of a legislative body.... The 1982 Guidelines ... were issued under the auspices of the Committee, and were signed by both co-chairmen of the Committee. The guidelines were a modification of, or a rider to, the national and regional contracts. They did not come to the Committee as the result of a grievance between an employer and a local union; rather they came before them as a proposal from labor and management committees....

*Warner v. McLean Trucking Co.*, 574 F.Supp. 291, 299 (S.D.Ohio 1983).

We do recognize that there is precedent for the OJSC to take such action since they had similarly approved the 1976 Flexible Work Week Guidelines. Nonetheless, we have still not been directed to any authority showing that the Committee actually had the legal authority to perform such a function. Moreover, even if we were to agree that this past practice may grant such authority impliedly, we believe that in the present case the OJSC went far beyond what it had done previously. According to

plaintiffs' uncontroverted allegation, in the past the OJSC required a vote by the affected membership every time a flexible work week was sought. This time, on the contrary, the OJSC made a substantive change in the NMFA by approving a rider that altered the permissible work week, it deleted the voting requirement from the implementation clause, and the OJSC did not require that the new Guidelines be submitted to a state-wide membership vote. Furthermore, in this instance the OJSC clearly sought to make these new Guidelines more than advisory; they attempted to make them binding upon plaintiffs by permitting their implementation without a vote by the affected members and over the opposition of the local.

We think it is clear that the OJSC was not acting purely as an arbitral entity in this episode. Since they did in fact approve a rider to the NMFA which purported to bind employees to employers, they were acting in a representational capacity, and were required to represent fairly the employees they sought to bind. Defendants have not put forward any conclusive evidence that they were performing arbitral duties in approving the new Guidelines. Consequently they have failed to meet their burden as the moving party. Their motion for summary judgment based on their arbitral immunity must therefore be denied.

(2) *Factual Basis for Breach of Duty of Fair Representation.*

▮ Even if this Court concludes that the OCT/OHDC and the OCT representatives on the OJSC owed plaintiffs a duty of fair representation, defendants contend that there is no evidence that they breached their duty. Again we cannot agree. We have already discussed the nature of the duty of fair representation above, and need not repeat it here. Rather we will only mention some of the facts alleged by plaintiffs which, if true, are sufficient indications of arbitrary, discriminatory, or bad faith actions by principals of the OCT, OHDC, and OJSC to defeat defendants' motion for summary judgment.

Plaintiffs have put forward evidence in support of their allegations that the OCT's actions in negotiating the Ohio Flexible Work Week Rider were in bad faith. For example, the OCT officers knew that many locals were having difficulty in getting the rank and file to approve flexible work weeks. Deposition of Harold Leu, at 73. The OCT therefore sought an alternative means of instituting the flexible work week, "so the locals themselves would not have to take heat from their membership over it." Letter of Richard Collinson, doc. 72, Exhibit N. This was despite the fact that they "were fully aware of the consequences." *Id.* The OCT did this by deleting the requirement for a vote by the affected members, and then by not permitting either the locals or the membership to approve the new rider. It is undisputed that the IBT Constitution required such a vote for any new rider. Moreover, there is no doubt that this requirement was known to and binding upon the OCT principals. Similarly the OCT representatives sitting on the OJSC were informed of this requirement and chose to ignore it.

Although it is undisputed that the OCT was authorized to negotiate the new Rider, there does appear to be a genuine dispute as to whether they were also authorized to ratify the Rider and implement it without further authorization. Even if they were, however, plaintiffs have put forward sufficient specific allegations concerning the OCT's actions to defeat this motion for summary judgment by demonstrating a factual basis for their claim that the OCT knowingly disregarded the plaintiffs' rights, and ignored their protests in bad faith, thereby breaching the duty of fair representation.

D. *Plaintiffs' Standing to Vacate OJSC Decision.*

▮ Defendants contend that plaintiffs lack standing to challenge the OJSC's decision granting McLean's request to implement the new flexible work week. They claim that plaintiffs cannot seek vacation of that order under 9 U.S.C. § 10 (1982)

because they are not a "party to the arbitration" within the meaning of section 10. There are several reasons why we do not agree that such a conclusion is mandated in this case. First, there appears to be significant question as to whether the OJSC's decision of October 14, 1982 was actually an arbitration decision. The hearing that day was not the result of the arbitration process outlined in the NMFA, Articles 44 and 45. Rather, it was merely McLean's application for OJSC sanction to implement the new flexible work week, as required by Article 7 of the Flexible Work Week Guidelines. The fact that the union opposed the implementation made the hearing resemble an arbitration because apparently both sides had an opportunity to present their cases. But we are not convinced that it was an arbitration since it did not conform to the NMFA procedures which require an attempt to resolve the conflict at the local level first.

Second, even if we were to agree with defendants that this was an arbitration, we could still find that plaintiffs have standing to seek vacation of the decision under section 301 rather than under 9 U.S.C. § 10. *See, e.g., Kallen v. National Union of Hospital & Health Care Employees,* 574 F.2d 723 (2d Cir.1978); *White Motor Corp. v. United Automobile Workers, Local 932,* 365 F.Supp. 314 (S.D.N.Y.1973), *aff'd* 491 F.2d 189 (2d Cir.1974). Therefore, defendants are not correct that as a matter of law plaintiffs have no standing to bring this claim and we deny that portion of their motion for summary judgment.

E. *Plaintiffs' Failure to Exhaust Intraunion Remedies.*

Plaintiffs allege that they were denied their right to vote on the new Flexible Work Week Guidelines and on the implementation of a new flexible work week at McLean, in violation of 29 U.S.C. § 411(a) (1982). Although section 101 guarantees union members the right to sue in federal court on such claims, it adds the proviso that the union member "may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officers thereof...." 29 U.S.C. § 411(a)(4) (1982). It is undisputed that plaintiffs in this case instituted suit after pursuing remedies under the NMFA, articles 44 and 45, but without pursuing the internal union remedies set forth in article XIX of the Teamsters' Constitution. Defendants assert that they are entitled to judgment as a matter of law due to plaintiffs' admitted failure to exhaust those intraunion remedies.

This is not the first time we have been faced with this question as between these parties. Over two years ago we denied the OCT"s motion for dismissal or for summary judgment based on plaintiffs' alleged failure to exhaust intraunion remedies because "intraunion remedies have not been shown to afford the possibility of the wide-reaching relief sought by plaintiffs." *Warner v. McLean Trucking Co.,* 574 F.Supp. 291, 298 (S.D.Ohio 1983). Moreover, we determined that the policy underlying the exhaustion doctrine was not clearly applicable on the facts of this case because more than the interpretation and application of a union constitution are involved. *Id.* at 297. Now discovery in this case is complete after the production of reams of documents, and both parties have had an ample opportunity to present their arguments on this issue again. We find, however, that in spite of the elegant presentation of the defendants, we must reaffirm our prior analysis of this issue.

Defendants have presented highly persuasive arguments and case authority in favor of their position. We recognize that the Teamster Constitution does contain a requirement that those "remedies provided for in this Constitution" must be exhausted before institution of suit elsewhere. IBT Const., art. XIX, § 12(a) (1981). Defendants also have convincingly shown that the IBT Constitution had internal remedies which plaintiffs could have utilized following the October 14, 1982 OJSC decision in order to charge that body as well as vari-

ous OCT, OHDC, or Local officials with violations of the Teamster Constitution. Although the provisions setting forth these procedures are long, they are not beyond the grasp or understanding of persons such as plaintiffs in this case. It is also apparent that the plaintiffs would have been able to pursue these remedies within the four month period because the Teamster procedures require a trial within ten days of notice to the accused. IBT Const., art. XIX, § 1(b) (1981).

Moreover, defendants have now demonstrated specifically that plaintiffs could have been afforded a broad range of relief, including possibly the reinstitution of the 1981 flexible work week or a vote by the affected members on the establishment of a different work week. Although it still appears likely that plaintiffs would not have been able to obtain all of the monetary relief sought in this suit, we are convinced that they could have sought rapid relief of their key complaint, i.e. the unlimited work week. We have no difficulty in concluding that plaintiffs could have, and probably should have at least attempted such internal union relief prior to this suit.

▬ Nonetheless, we remain reluctant to impose the exhaustion requirement on the facts of this case. It is well established that it is within the sound discretion of the court to determine whether to require exhaustion of intraunion remedies prior to filing suit. *See, e.g., Clayton v. International Union, United Automobile Workers of America,* 451 U.S. 679, 689, 101 S.Ct. 2088, 2095, 68 L.Ed.2d 538 (1981). Moreover, after our exhaustive review of the facts in this case, we remain convinced that it cannot be characterized as one involving only the interpretation and application of the union constitution. Plaintiffs have produced some evidence suggesting that this case involved a conscious and purposive effort on the part of some union officials and employers to impose a change in the collective bargaining agreement on plaintiffs in violation of their rights under the IBT Constitution, and the "Workers Bill of Rights." They have also put forward suf-

ficient evidence of bad faith, hostility, or inattention on the part of some union officials to demonstrate that the pursuit of intraunion relief might well have been futile. In short, we conclude that on the facts of this case exhaustion of intraunion remedies was not a necessary prerequisite to seeking relief from this Court. Accordingly, this portion of defendants' motion for summary judgment is denied.

## V. SUMMARY

The central claim in this case is that plaintiffs did not get to vote on the new flexible work week implemented by McLean in 1982. Plaintiffs were not able to vote as a consequence of two developments, each of which is the basis for some of the claims asserted by plaintiffs in this case. First, a new set of Guidelines for a Flexible Work Week was negotiated and signed by the OCT/OHDC and the Ohio Motor Carriers Labor Relations Association, and approved by the OJSC, eliminating the requirement of a vote by the affected members prior to implementation of a flexible work week. This development is the basis for plaintiffs' charges against the OCT/OHDC and OJSC for breach of their duty of fair representation. We have found that all of these defendants are proper defendants for such an action because they were acting in the capacity of bargaining representatives in negotiating and approving a contract modification which purported to bind plaintiffs. The process of negotiating and approving this new set of Guidelines was also the basis for plaintiffs' charges that these organizations breached the IBT Constitution, a charge over which we have held above that we have no section 301 subject matter jurisdiction.

The second development that contributed to the plaintiffs being denied their right to vote was that McLean was authorized by the OJSC to implement a new flexible work week without the approval of the affected members and over the opposition of Local 100, whose approval was required in the implementation article of the Guidelines. This event forms the basis for several more

of plaintiffs' charges. First, it is the basis for the claim that McLean breached a contract. We have found herein that McLean's actions did not constitute a breach of the 1981 McLean Breakbulk Agreement, but we also concluded that McLean had failed to show that it did not breach the new Guidelines, which we determined were a valid rider to the NMFA. Second, this event is the basis for claiming that McLean bargained with plaintiffs in bad faith in negotiating the 1981 Breakbulk Agreement. Third, this is the basis for the charge that McLean breached a duty of fair representation by its cooperative actions in conjunction with the union defendants. Neither of these allegations have been addressed in this memorandum and order, and they remain for trial. Fourth, the OJSC approval of McLean's acts constitutes the basis for plaintiffs' claim that the OJSC breached the IBT Constitution, something which is outside our jurisdiction. Further they claim that the OJSC deprived plaintiffs of their rights under 29 U.S.C. § 411(a) because other locals had been given the opportunity to vote in similar circumstances. We have concluded that plaintiffs were not required to exhaust intraunion remedies before bringing these charges, and that these claims are properly before this Court.